OPINION OF THE COURT
Jones, J.
Neither the decision of the Supreme Court of the United States in Caban v Mohammed (441 US 380) nor its rationale is applicable to an adoption proceeding which had been finally determined and concluded prior to the announcement of that decision. Nor was it an abuse of discretion in the circumstances of this case for the Family Court Judge either to grant the final order of adoption without giving notice to the putative father of whose identity and interest the Judge previously had knowledge or thereafter to deny the application of the putative father to vacate the final order of adoption and to reopen the adoption proceedings.
*422 The factual context out of which the legal issues presented in this case arise is not significantly disputed. The mother respondent in this proceeding and petitioner had lived together for two years prior to the birth of Jessica on November 9,1976. In August, 1977 the mother married her present husband, the other respondent.
On December 21, 1978 the stepfather, joined by the mother, instituted a proceeding in Family Court, Ulster County, for his adoption of Jessica. A hearing in that proceeding was held on January 15, 1979 at the conclusion of which the Family Court Judge ordered the Ulster County Social Services Department to make the customary investigation pursuant to the provisions of section 116 of the Domestic Relations Law. When the favorable report of that investigation (which addressed only the mother, the adoptive father and Jessica) was received on February 26, the mother’s attorney informed the Family Court Judge that petitioner had instituted a paternity proceeding in Family Court, Westchester County, claiming to be Jessica’s father.[1] At the instance of the attorney the Family Court Judge in Ulster County signed an order to show cause returnable March 12, 1979 (the return date in the paternity proceeding) bringing on the mother’s application to change the venue of the paternity proceeding from Westchester to Ulster County. Petitioner was served with a copy of the order to show cause on Saturday, March 3,1979, and then learned for the first time of the pendency of the adoption proceeding. On the following Wednesday, March 7, 1979, at the request of the attorney for respondents, the Family Court Judge signed the final order of adoption. Thereafter, but on the same day, the attorney for petitioner telephoned the Family Court Judge to request an adjournment of the adoption proceedings and was informed that his request came too late inasmuch as the final order of adoption had already been signed.
Subsequently, by petition verified on June 13, 1979, petitioner instituted the present proceeding to vacate the final *423 order of adoption and. to reopen the adoption proceedings.[2] That application was denied by the Ulster County Family Court on November 30, 1979. The Appellate Division affirmed, one Justice dissenting, on December 11,1980. Petitioner has appealed to our court as of right pursuant to CPLR 5601 (subd [a], par [i]).
At the outset we take note of the nature of the case before us. It involves an attempt, in an independent proceeding, by one who was not a party to a judicial proceeding which has been concluded to mount a direct attack on the final determination made therein. It is to be distinguished from the more frequently encountered attempt of one who was a party to a judicial proceeding which concluded in a disposition adverse to him, to enlist the aid of the courts to vacate or modify that disposition by means other than direct appellate review.
In this perspective we first address the constitutional contentions advanced by petitioner. He asserts that as Jessica’s father he had a constitutional right to receive formal notice of the adoption proceeding (and thus to participate therein) and that granting the order of adoption without his consent deprived him of his constitutional rights. He would rely heavily on the decision of the Supreme Court of the United States in Caban v Mohammed, (441 US 380, swpra) in which that court, reversing a decision of our court (Matter of David A. C., 43 NY2d 708), held that section ill of the Domestic Relations Law was unconstitutional in that it arbitrarily discriminated between mothers and fathers of children born out of wedlock by requiring the consent to adoption of the former but not of the latter. It is petitioner’s submission that that decision mandates a reversal of the orders of the lower courts in this case denying his application to vacate the order of adoption and to reopen the adoption proceeding. He argues that to the extent that section 111-a did not require that he be given formal notice of the adoption proceeding and that section 111 did not provide that his consent was required before Jessica could *424 be adopted, each section is unconstitutional as denying him the equal protection and due process rights enunciated in Caban.
We have no occasion to reach or resolve the substantive aspects of petitioner’s contentions. The decision in Caban was announced on April 24, 1979, nearly seven weeks after the final order of adoption in this case. The adoption proceeding was completed with the entry of that order. The present application, as previously noted, is a posttermination attack on the final determination in the adoption proceeding by one who was not a party to that proceeding.[3] We conclude that, unless the Supreme Court itself accords full retroactive effect to its holding, the decision and the rationale of Caban should be applied only to actions and proceedings that were still in the judicial process at the time the decision was announced or that have since been commenced, and not to actions and proceedings which had been finally determined and whose judicial life had then expired (cf. People v Torres, 53 NY2d 213; see Gager v White, 53 NY2d 475, 482). To accord full retroactive effect to Caban and to the extension of its rationale to the notice requirements of our adoption statute (and thus to allow its doctrine to be invoked on applications attacking adoption proceedings long since finally concluded) would be, as the dissenters in Caban implied (441 US 380, 401, 415-416, supra), to work cruel havoc. Accordingly, we hold that sections 111 and 111-a of the Domestic Relations Law as invoked in the adoption proceeding here are immune from constitutional assault predicated on Caban and its rationale in the present postfinal determination proceeding (cf. Chevron Oil Co. v Huson, 404 US 97, 106-107.)[4]
*425 Still bearing in mind that petitioner was not a party to the adoption proceeding and having concluded that Caban gives him no constitutional right to disturb its final disposition, we turn to his contentions that it was an abuse of discretion in the circumstances for the Ulster County Judge first to have signed the final order of adoption on March 7, 1979 and then later to have denied petitioner’s application, in the proceeding now before us, to vacate that final order and to reopen the adoption proceedings. Our evaluation of petitioner’s assertions of abuse of discretion must be judged, not with the benefit of informed hindsight, but on the basis of what was known to the Family Court Judge at the time he signed the final order of adoption and at the time he denied the application to vacate and to reopen the adoption proceedings.
On March 7, 1979 all the statutory prerequisites to the signing of a final order of adoption had been met. All persons made necessary parties under our statutes and decisional law at that time were before the court, and the only consent then so required, that of the mother, had been obtained. Petitioner does not claim that he came within any of the seven categories then defined in paragraphs (a) through (g) of subdivision 2 of section 111-a of the Domestic Relations Law[5] as statutorily entitled to notice of the *426 proceeding or that the necessity of his consent to the adoption was specified in the provisions of section 111. The court had received the report of investigation made by the Ulster County Department of Social Services as required by section 116 of the Domestic Relations Law which was in all respects favorable to the adoption. Accordingly, being “satisfied that the best interests of the adoptive child [would] be promoted thereby” the Family Court Judge made the order approving the adoption. There was then no reason to consider any possible rights that petitioner might have inasmuch as our court, and apparently the Supreme Court, had recently declared that he had none (cf. Matter of Malpica-Orsini, 36 NY2d 568, app dsmd sub nom. Orsini v Blast, 423 US 1042).
At the threshold we reject petitioner’s assertions that the order of adoption should be set aside because respondents fraudulently concealed information from the Family Court and because the Family Court improperly waived a statutory prerequisite for adoption. The claim of fraudulent con *427 cealment is constructed on two propositions, first, that the mother submitted documentary evidence which she knew to be false, to wit, Jessica’s birth certificate, and second, that she failed “to divulge to the court the factual background of the life of the natural parents and the infant”. On examination it appears that the substance of the argument on both branches is the asserted failure of the mother to admit that petitioner was Jessica’s father and to bring petitioner’s existence and identity, as father of Jessica, to the attention of the Family Court. There is no merit to this argument. The natural mother had no obligation to admit paternity or to volunteer any information with respect to petitioner, and there is nothing in the record to suggest that she failed to respond fully to all queries put to her by the court or by the Ulster County Social Services Department when it conducted the court-ordered investigation. And, of course, as petitioner vigorously asserts as basic predicate for his entire application, the Family Court was fully aware of his existence and identity as well as his claim of paternity before the final order of adoption was granted.
Similarly, there is no merit to petitioner’s assertion (with its attendant insinuations) that the family Court Judge “waived the six months’ residency requirement”. Section 116 of the Domestic Relations Law on which he premises his assertion explicitly excepts from its prescribed waiting period instances in which “the spouse of the adoptive parent is the natural parent of the child and the child has resided with the natural parent and adoptive parent for more than six months”, both of which stipulations were indisputably met in this case.
The only contention of substance advanced by petitioner is that it was an abuse of discretion on the part of the Ulster County Family Court Judge, with knowledge of petitioner’s identity and of his assertion that he was Jessica’s father, to have granted the order of adoption without first having required at least that he be given the notice required by subdivision 4 of section 111-a. The Family Court Judge could, in the exercise of discretion, have required that formal notice be given petitioner (Domestic Relations Law, § 111, subd 3). If we were to hold, however, that notice *428 was required to be given to this putative father we would in effect be superimposing a judicial amendment on subdivision 2 of section 111-a — a requirement that notice be given to all putative fathers of which the court had knowledge — for there is nothing in the record in this case to distinguish this petitioner from any putative father of which the adoption court might have actual knowledge.[6]
Section 111-a was added to the Domestic Relations Law by chapter 665 of the Laws of 1976 in consequence of a legislative proposal advanced by the Temporary State Commission on Child Welfare in response to constitutional concerns for the rights of fathers of children born out of wedlock following the decision of the Supreme Court of the United States in Stanley v Illinois (405 US 645). It was intended to codify the minimum protections which Stanley would require and to achieve finality as early as possible. (Letter from the chairman of the temporary commission to the Governor’s counsel, dated July 7, 1976, in the bill jacket for chapter 665; Governor’s memorandum on approving the chapter, July 24, 1976, McKinney’s Session Laws of NY, 1976, p 2442.) In prescribing who was entitled to notice the Legislature carefully delineated within the board class of putative fathers, to include some (those described in the paragraphs of subdivision 2 of section 111-a) and to exclude the remainder. This was evidently a carefully considered line of demarcation. Proposals had been pressed to expand the categories of putative fathers to whom notice should be required to be given to include fathers who had “filed” acknowledgments of paternity, persons “known” by the mother to be the father, persons holding themselves out to be fathers, and men “voluntarily supporting the child”. Such expansion of the notice requirements was rejected as failing to recognize that many of the putative fathers in such categories would *429 not be readily identifiable, as thus ignoring the need for a measure of “finality in completed adoptions”, and as creating “a constant danger of having failed to give notice resulting thereafter in the reopening of consummated adoptions”. (Id.) For the Family Court Judge in this instance to have required that notice be given to petitioner for no other reason than that the Judge knew that he claimed to be the father of Jessica would have been to act in derogation of the legislative determination not to include such putative fathers within the scope of section 111-a. As stated, there was no reason to distinguish petitioner from any other putative father who would not be entitled to notice under the terms of the statute.
Moreover, the Legislature had declared that “the sole purpose of notice under [section 111-a] shall be to enable the person served pursuant to subdivision two to present evidence to the court relevant to the best interests of the child” (§ 111-a, subd 3). Petitioner had made no tender of his ability to furnish any particular or special information relevant to Jessica’s best interests. Nor had anything otherwise been brought or come to the attention of the Family Court Judge suggesting that petitioner would be a source of such information — other, of course, than as it could be claimed by every putative father that he was in a position to give background information.
In concluding as we do that there was no abuse of discretion in failing to require that notice be given to petitioner prior to the granting of the final order of adoption, we recognize that there may be a superficial appearance, chiefly because of the brevity of time intervals, which might make one wonder whether it would not have been better in this case to have postponed signature of the final order of adoption until notice had been given to petitioner. We believe, however, that such appearance, if any, arises solely from hindsight and in particular from the unanticipated announcement, but a few weeks later, of the Supreme Court decision in Caban which accorded all putative fathers substantially greater legal rights than they previously had been recognized as having. We are willing to speculate, however, that had Caban not emerged on the judicial hori *430 zon when it did, the decision made by this Family Court Judge to proceed as he did in this case would have clearly appeared to be the only prudent course of action to have followed in the best interests of Jessica.[7]
Finally, we reach petitioner’s contention that, even if it was not an abuse of discretion to have granted the order of adoption without having first given him notice, it was an abuse of discretion not to have granted his postadoption application in June, 1979 to reopen the adoption proceeding. Again, although the Family Court Judge had authority to grant that application (Domestic Relations Law, § 114), he chose, in a fully explicated decision, not to do so, and the Appellate Division has affirmed his determination. Here, too, his decision must be examined in the light of the submission then made to him. The court’s principal attention and responsibility in any adoption proceeding must be riveted on the best interests of the adoptive child; only secondarily may consideration be given to the interests of the parents. In this instance, the petition and supporting papers contained no tender of evidence directly bearing on the best interests of Jessica. There was a submission with respect to the history of the mother’s alleged emotional instability, but this was essentially irrelevant inasmuch as no proposal was advanced at any time that Jessica should be removed from her mother’s custody or the home in which she dwelt with her mother and her stepfather; petitioner has never sought more than rights of visitation. In this circumstance it was certainly reasonable to deny petitioner’s application to reopen the adoption proceedings, the conse *431 quence of which, as was then apparent, would have been to render Caban applicable and thereby to accord petitioner not only a right to notice but a power of veto over any adoption, beyond the reach of the court’s to. supervise or to dispense with, whatever the dictates of Jessica’s best interests. It requires no exercise of the imagination in the circumstances of this case to understand why the Family Court Judge would not have deemed any such course of action to be in Jessica’s best interests. In sum, we again conclude that there was no abuse of discretion when petitioner’s application to reopen the adoption proceedings was denied.
For the reasons stated, the order of the Appellate Division should be affirmed, with costs.

. The paternity proceeding had been commenced on January 30, 1979 and personal service of the summons therein made on the mother on February 22, 1979.

. The petition also sought an order unsealing the records in the adoption proceeding to permit their inspection by petitioner. The denial of that relief by the Ulster County Family Court was also affirmed at the Appellate Division.

. There is no merit to petitioner’s argument that the adoption proceeding should be deemed to have still been in the appellate process in consequence of his filing a purported notice of appeal from the final order of adoption on April 23, 1979. Whatever other rejoinders might be made, it suffices for present purposes to observe that his right to appeal has never been accorded judicial recognition nor has any appeal based on the purported notice of appeal ever been perfected. The present proceeding stems from the order to show cause obtained by petitioner on his petition initiating an independent proceeding to attack the final order of adoption.

. In view of this conclusion, we have no occasion and do not consider *425 respondents’ contention that, inasmuch as petitioner did not come within the embrace of any of the seven categories of subdivision 2 of section 111-a, he has no standing to challenge the constitutionality of the section.
There is no merit to petitioner’s contention that the provisions of chapter 575 of the Laws of 1980, amending section 111-a and enacting a new section 111-b apply to this case. The adoption here became final on March 7, 1979 prior to the enactment of chapter 575.

. Subdivisions 2 to 4 of section 111-a as they existed on March 7, 1979, i.e., prior to amendment by chapter 575 of the Laws of 1980 provided:
“2. Persons entitled to notice, pursuant to subdivision one of this section, shall include:
“(a) any person adjudicated by a court in this state to be the father of the child;
“(b) any person adjudicated by a court of another state or territory of the United States to be the father of the child, when a certified copy of the court order has been filed with the putative father registry, pursuant to section three hundred seventy-two-c of the social services law;
“(c) any person who has timely filed an unrevoked notice of intent to claim paternity of the child, pursuant to section three hundred seventy-two-c of the social services law;
*426 “(d) any person who is recorded on the child’s birth certificate as the child’s father;
“(e) any person who is openly living with the child and the child’s mother at the time the proceeding is initiated and who is holding himself out to be the child’s father;
“ (f) any person who has been identified as the child’s father by the mother in written, sworn statement; and
“(g) any person who was married to the child’s mother within six months subsequent to the birth of the child and prior to the execution of a surrender instrument or the initiation of a proceeding pursuant to section three hundred eighty-four-b of the social services law.
“3. The sole purpose of notice under this section shall be to enable the person served pursuant to subdivision two to present evidence to the court relevant to the best interests of the child.
“4. Notice under this section shall be given at least twenty days prior to the proceeding by delivery of a copy of the petition and notice to the person. Upon a showing to the court, by affidavit or otherwise, on or before the date of the proceeding or within such further time as the court may allow, that personal service cannot be effected at the person’s last known address with reasonable effort, notice may be given, without prior court order therefor, at least twenty days prior to the proceeding by registered or certified mail directed to the person’s last known address or, where the person has filed a notice of intent to claim paternity pursuant to section three hundred seventy-two-c of the social services law, to the address last entered therein. Notice by publication shall not be required to be given to a person entitled to notice pursuant to the provisions of this section.”

. Such a holding might be mischievous in affording a substantive basis for an argument (not unlike that made by petitioner here) that, inasmuch as knowledge of the adoption court of the existence of a putative father would confer legal rights on him, the failure of the natural mother (who could be expected to know his identity) to identify him to the court should be classified as the perpetration of a fraud on the court in consequence of concealment from it of a material fact.

. Viewing the situation from the perspective of other steps petitioner might have taken, it may be observed that the record discloses that petitioner was aware of the mother’s address when his attorney addressed a letter to her on December 12,1978 seeking to arrange a visitation with “your daughter, Jessica”. A follow-up letter was sent on January 8,1979. Thus, petitioner knew of Jessica’s location well before March of 1979. It was open to him for several months prior to the final adoption, had he so desired, to file a notice of intention to claim paternity of Jessica pursuant to section 372-c of the Social Services Law. The filing of such notice would have assured him the right which he sought to participate in the adoption proceedings (Domestic Relations Law, § 111-a, subd 2, par [c]). Additionally, as the Family Court Judge noted, he could have made a prompt application to intervene in the adoption proceeding once notice of its pendency was brought to his attention (CPLR 401, 1012, subd [a] ; 1013).