**Steven H. SWAYNE, Plaintiff,**

v.

**L.D.S. SOCIAL SERVICES, John Doe, Jane Doe and Leslie Doe, in his or her official capacity as a District Court Judge of the Third District Court of the State of Utah, Defendants.**

Civ. No. 87–C–0591G.

United States District Court,
D. Utah, C.D.

Sept. 3, 1987.

**1538**

M. David Eckersley, Billy L. Walker, Jr., Salt Lake City, Utah, for plaintiff.

David M. McConkie, B. Lloyd Poelman, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came on for hearing on July 27, 1987 on defendants' motion to dismiss and plaintiff's motion for a preliminary injunction. Defendants were represented by David M. McConkie and B. Lloyd Poelman and plaintiff was represented by M. David Eckersley and Billy L. Walker, Jr. Plaintiff and defendants submitted memorandums of law and a stipulated statement of facts and the court heard oral argument, after which the matters were taken under advisement. The court is now fully advised and sets forth its Memorandum Decision and Order.

### BACKGROUND

This suit is brought by plaintiff against L.D.S. Social Services, a non-profit private adoption agency affiliated with the Church of Jesus Christ of Latter-day Saints; John Doe and Jane Doe, who are prospective adoptive parents of the newborn child of which plaintiff is the biological father; and Leslie Doe, who is asserted to be a District Court Judge of the Third District Court of Utah who plaintiff believes has presently before him or her a petition for adoption. Plaintiff has brought suit under 42 U.S.C. § 1983 and requests that this court declare that he has the right of custody, care and control of the newborn child, that the provi-sions of Utah Code Ann. § 78-30-4 (1984) be declared violative of the United States Constitution, that Judge Doe be enjoined from entering any Decree of Adoption without plaintiff's consent, and that damages be awarded as against defendant L.D.S. Social Services. The immediate matter of a preliminary injunction involves a request by plaintiff that he be granted custody and that defendant L.D.S. Social Services be enjoined from continuing to exercise custody over the child.

Plaintiff and defendants have filed a statement containing the following stipulated facts:

1. Steven Swayne is the natural father of a baby girl born out of wedlock on June 4, 1987.

2. Penny Paxman is the mother of the child.

3. Both Steven Swayne and Penny Paxman are life-long residents of the State of Utah and resided in the State of Utah at all times pertinent to the facts and circumstances in this matter.

4. Steven Swayne first learned that Penny Paxman was pregnant in October, 1986.

5. Steven Swayne and Penny Paxman are not now married nor have they ever been married. At no time during Penny Paxman's pregnancy or prior to the relinquishment of the child to L.D.S. Social Services did Steven Swayne offer to marry Penny Paxman or offer to financially support Penny Paxman.

6. At no time during the pregnancy or prior to the relinquishment of the child did Steven Swayne and Penny Paxman have any plan or intention to live together in a family unit.

7. Steven Swayne was present in the hospital when the child was born on June 4, 1987, and visited the child and Penny Paxman while they were in the hospital. While in the hospital, Mr. Swayne was told that it was necessary for him to sign a document in order to have his name placed on the child's birth certificate. Mr. Swayne did not sign the necessary document or acknowledgment of paternity before the child was discharged from

the hospital or before the child was relinquished to L.D.S. Social Services and therefore his name does not appear on the child's birth certificate.

8. Penny Paxman's mother discharged Penny and the baby from the hospital on June 6, 1987, and made financial arrangements for hospital expenses. Mr. Swayne has not paid any of the hospital expenses or paid any of the expenses for the baby's support.

9. Prior to the pregnancy and during the course of the pregnancy, Penny Paxman resided with her parents. After being released from the hospital, Penny Paxman and her child returned to her parent's home.

10. Steven Swayne offered to make arrangements for Penny Paxman to move in with his mother. However, Penny Paxman would have provided her own living expenses.

11. Penny Paxman signed an affidavit releasing the child to L.D.S. Social Services on June 8, 1987, and physically surrendered custody of the child the next day.

12. Steven Swayne did not register with the Registrar of Vital Statistics in the Department of Health a notice of his claim of paternity of an illegitimate child and of his willingness and intent to support the child to the best of his ability prior to the date the illegitimate child was relinquished or placed with L.D.S. Social Services for adoption.

13. Steven Swayne filed his acknowledgment of paternity on June 15, 1987, which was the first working day after he learned that the child had been placed for adoption.

14. During the course of the pregnancy, Steven Swayne and Penny Paxman discussed the fact that Penny Paxman's parents wanted her to place the baby for adoption. Penny Paxman did not inform Mr. Swayne that she did or did not intend to surrender the child for adoption.

15. L.D.S. Social Services placed the child for adoption with an adoptive family on June 12, 1987, in conformity with the requirements of Utah statutes.

16. In the event Steven Swayne is granted custody of the child, Mr. Swayne intends to place the child under the primary care of members of his family until such time as he can become more stable.

17. On June 15, 1987, Steven Swayne and Penny Paxman requested an amendment to the birth certificate of the child naming Steven Swayne as the father of the child.

18. During the course of the pregnancy and thereafter Mr. Swayne told his family and others that he was the father of the child.

19. Penny Paxman took the baby to Steven Swayne's apartment for a short visit once before the relinquishment to L.D.S. Social Services and once after the relinquishment.

20. Mr. Swayne was unaware of his duty to file an acknowledgment of paternity and willingness to support the child until after the child had been released by the mother for adoption.

21. On June 15, 1987, both Mr. Swayne and Penny Paxman appeared at the offices of L.D.S. Social Services and asked that custody be given to Mr. Swayne.

22. L.D.S. Social Services has testified that at the time of the relinquishment of the child to L.D.S. Social Services Penny Paxman did not disclose the identity of Steven Swayne and advised L.D.S. Social Services that he would not take responsibility for the child and that she did not want L.D.S. Social Services to contact him.

23. On February 9, 1986, Steven Swayne consented to the adoptive placement of another illegitimate child by a different woman. L.D.S. Social Services requested and obtained his consent.

Defendant L.D.S. Social Services urges this court to dismiss plaintiff's complaint for lack of jurisdiction because of failure to allege "state action," and on the further ground that this court should abstain from exercising jurisdiction in favor of resolution by the state courts of Utah. The defendants also urge dismissal of plaintiff's motion for preliminary injunction pri-

marily because of lack of substantial likelihood of success on the merits.

## LEGAL ANALYSIS

### I. *State Action*

The Fourteenth Amendment to the United States Constitution provides in part: *"No state* shall make or enforce any law which shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (emphasis added). The protections of the Fourteenth Amendment thus apply only if the deprivation of life, liberty, or property is by governmental "state action" rather by than purely private action. The fundamental policies of the state action principle are to preserve an area of individual freedom to make choices without the constraints of the Constitution's prohibitions, to further the policy of federalism by reserving to the state discretion to deal with perceived private wrongs without the constraints of supreme federal law, and to further the policy of separation of powers by limiting the wrongs redressable by the federal judiciary absent congressional enactment granting such authority.[1]

The "liberty" interest asserted by plaintiff in this case involves termination of all parental rights in connection with his newborn child, including visitation and custodial rights. Without delving deeply into the merits, this court recognizes that plaintiff has asserted a liberty interest that has been acknowledged by the Supreme Court to be worthy of constitutional protection.[2]

---

1. See *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936–37, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *Peterson v. Greenville,* 373 U.S. 244, 250, 83 S.Ct. 1119, 1133, 10 L.Ed.2d 323 (1963) (Harlan, J., concurring and dissenting); *Civil Rights Cases,* 109 U.S. 3, 17, 3 S.Ct. 18, 25, 27 L.Ed. 835 (1883); *see generally* L. Tribe, *American Constitutional Law,* § 18–2 at 1149 (1978).

2. In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) the Court recognized the weighty "liberty" interest of one father of illegitimate children in maintaining custody of those children with whom he had a fully developed parental relationship:

> The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." *Kovacs v. Cooper* [336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949)].... The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska* [262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)] ... "basic civil rights of man," *Skinner v. Oklahoma,* [316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)] ... and "[r]ights far more precious ... than property rights," *May v. Anderson* [345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953)].... "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither

supply nor hinder" *Prince v. Massachusetts* [321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944)]....

*Id.* at 651, 92 S.Ct. at 1212. More recently the Court distinguished the lesser constitutional interest of a putative father in the *potential* to develop a future parental relationship with his child:

> The difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban* [*v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)], and the *potential relationship* involved in *Quilloin* [*v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978)] and this case, is both clear and significant. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," *Caban,* ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children...." *But the mere existence of a biological link does not merit equivalent constitutional protection....* The significance of the biological connection is that it offers the natural father an *opportunity* that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Lehr v. Robertson,* 463 U.S. 248, 261–62, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983) (emphasis added). Some courts and commentators

The statute which plaintiff seeks to challenge under due process and equal protection provides that the father of an illegitimate child conclusively is presumed to have abandoned his child if he fails to file a claim of paternity and notice of willingness to support the child prior to the time the child is placed by the mother with a licensed adoption agency, or prior to the time a petition is filed by a person with whom the mother has placed the child for adoption.[3] The state action question is whether termination of plaintiff's parental rights by operation of the above statute implicates the actors in a private adoption to the extent that they may be considered to be state actors for the purpose of testing whether plaintiff's parental rights were constitutionally terminated. This court is persuaded that the statute has such an effect. In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) the Supreme Court delineated a two-step inquiry in resolving the issue of state action:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person

who may fairly be said to be a state actor.

*Id.* at 937, 102 S.Ct. at 2753–54. There can be no question but that under Utah's statutory scheme the first part of the *Lugar* test is met. "Undoubtedly the State was responsible for the statute." *Lugar*, 457 U.S. at 938, 102 S.Ct. at 2754. Since the first test is met, this court must determine whether operation of the statute in this case implicates defendants L.D.S. Social Services and the prospective adoptive parents to a degree whereby they "may fairly be said to be state actor[s]." *Id.* at 937, 102 S.Ct. at 2754.

■ In focusing on the second determination, there is a critical distinction in the operation of the above statute as compared with many other state laws which may be invoked by private parties. Here, the statute involved is *self-operative* and *mandates* the resultant termination of an illegitimate father's parental rights. The State of Utah, not a private party, has made an official policy decision that anytime custody of an illegitimate child is relinquished by the mother, the father's parental rights will be automatically cut off unless a notice of paternity previously has been filed by the biological father. That state decision to terminate the father's pa-

have determined that the potential interest recognized in *Lehr* may require greater constitutional protection if it is asserted, as in this case, at or near the time of birth rather than after a significant lapse of time as in *Lehr*. *See In re Matter of Baby Girl Eason*, 257 Ga. 292, 358 S.E.2d 459 (1987); *In re Baby Girl M*, 37 Cal.3d 65, 207 Cal.Rptr. 309, 688 P.2d 918, 924 (1984); E. Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson*, 45 Ohio St.L.Rev. 313, 351–371 (1984). That question need not be resolved in analyzing state action. It should be noted, however, that the liberty interest asserted here is subject to the lesser protection of *Lehr* as an *opportunity to develop* a relationship with the child, rather than non-interruption of an existing relationship.

**3.** The statute reads in relevant part:
(1) A child cannot be adopted without the consent of each living parent having rights in relation to said child....

. . . . .

(3)(a) A person who is the father or claims to be the father of an illegitimate child may

claim rights pertaining to his paternity of the child by registering with the registrar of vital statistics in the department of health, a notice of his claim of paternity of an illegitimate child and of his willingness and intent to support the child to the best of his ability.... (b) The notice may be registered prior to the birth of the child but *must be registered prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services or prior to the filing of a petition by a person with whom the mother has placed the child for adoption....* (c) Any father of such child who fails to file and register his notice of claim to paternity and his agreement to support the child *shall be barred from thereafter bringing or maintaining any action to establish his paternity of the child. Such failure shall further constitute an abandonment of said child and a waiver and surrender of any right to notice of or to a hearing in any judicial proceeding for the adoption of said child, and the consent of such father to the adoption of such child shall not be required.*
(Emphasis added.)

rental rights is implemented through the actor or actors who accept the child for placement, whether a state entity, a private licensed adoption agency, or any other person, for example an attorney. It would be a total fiction to allow the state to remove itself from *its decision* to cut off parental rights simply because a private party triggers operation of the statute. The only fair conclusion is that such a private party becomes a "state actor" when his or her actions bring the statute into play so as to effectuate the pre-determined state decision to terminate parental rights.

This is not a case wherein state action could be found because the legislation encouraged a private decision to discriminate.[4] Also, it is not a case wherein the decision of a private party to discriminate based upon race or sex amounts to a state decision because the private actor has some "state" attributes or connection, such as state funding or regulation.[5] This case is also distinguishable from the slippery slope of private dispute resolution whereby a private party makes necessary use of some state procedure and thereafter is challenged as a "state actor" for having deprived a plaintiff of liberty or property based upon the state's involvement in creating such procedure or in failing to create other procedures. State action may not be present in the categories of cases just mentioned because in those cases private parties, rather than the state, made the essential decision to attempt to deprive a plaintiff of his or her liberty or property interest.[6]

Another consideration which comes into play in determining whether state action is present is the distinction between property interests and liberty interests. Unlike disputes involving property in which private parties may agree to some allocation or disposition without any state involvement, oftentimes the liberty interest can *only* be severed by the state. The distinction is apparent in child custody-parental right cases. Although a private party may deprive a parent of physical custody of his child, only the state can irrevocably sever all parental rights, which rights are recognized as being "far more previous than property rights."[7]

This court considers that under the circumstances of this case the conduct by private actors amounted to state action. This conclusion follows from consideration of the evident state mandated decision set

---

4. Defendants have cited several cases for the proposition that when a private party acts pursuant to a state law, there is state action only if the state law authorizes conduct that was impermissible *prior* to the enactment. For example in *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) the Supreme Court determined that an amendment to the California constitution permitting private discrimination in real estate transactions, which was previously prohibited by statute, constituted an official encouragement to the private decision to discriminate, thereby transforming such private decisions into state action. However, *Reitman,* and the cases cited by defendants deal with a completely different situation than is presented here. In those cases the question was whether a private decision may be attributed to the State because it was encouraged by a state statute. Here the statute in question increased rather than decreased the rights of putative fathers over what was recognized at common law. Accordingly, that statute would seem to have no impact upon determination of the "state actor" question.

5. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961);

*see also Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

6. *Compare, Flagg Brothers Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); (no state action present) with *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (state action present).

7. *Santosky v. Kramer,* 455 U.S. 745, 758, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). The Supreme Court said of the state's power to terminate parental rights:

   Lassiter declared it "plain beyond the need for multiple citation" that a natural parent's "desire for and right to 'the companionship, care, custody, and management of his or her children'" is an interest far more precious than any property right ... when the state initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it.... *Few forms of state action are both so severe and so irreversible.*

   *Id.* at 758–59, 102 S.Ct. at 1397 (emphasis added); *see also* discussion at footnote 2, *supra.*

forth in the self operative statute, and is supported by several factually specific "tests" of the Supreme Court. Perhaps most readily applicable is the "public function" test.[8] In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) the Court dealt with an individual decision by a privately owned utility company to terminate a plaintiff's utility service without notice and hearing. In *Jackson* the court stated:

> Petitioner next urges that state action is present because respondent provides an essential public service required to be supplied on a reasonably continuous basis ... and hence performs a "public function." We have, of course, found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State.... If we were dealing with the exercise by Metropolitan of *some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one.*

**8.** In *Lugar* the court commented on its prior "tests" for attributing state action to otherwise private actors:

> [The] "something more" which would convert the private party into a state action might vary with the circumstances of the case.... [T]he court has articulated a number of different factors or tests in different contexts: e.g., the "public function" test ...; the "state compulsion" test ...; the "nexus" test ...; and, in the case of prejudgment attachments a "joint action test." Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the court in such a situation need not be resolved here.

Although this court relies on the public function test, that reliance is not to the exclusion of the other Supreme Court tests. It is just that within these facts the other tests seem to be encompassed by the public function test. Nevertheless, the extensive regulation of private agencies by Family Services also could be considered to establish a sufficient "nexus." "State compulsion" and/or "joint actions" may also exist in that the Utah statute "encourages" and "authorizes" the resultant termination of parental rights when the private adoption agency chooses to take custody of the child. Also, a symbiotic relationship exists between private agencies and the state because as defendants concede the private agencies reduce the cost that would necessarily have to be born by the state to place

419 U.S. at 352–53, 95 S.Ct. at 454 (emphasis added). In this case we are dealing with a traditional function of the state. This case involves the principle of *parens patriae* (parent of the country) whereby the sovereign is under the duty to act as guardian for those under legal disability. The State of Utah has an exclusive and traditional *duty* to assure that a child whose custody has been released to the state by the natural mother will be placed in the care of appropriate substitute parents. Although traditionally many private actors and family members voluntarily have stepped into parental roles when natural parents have suffered a disability, that voluntary conduct was not the result of a legal duty. The State of Utah is the sole party with such duty. In furtherance of that duty the state has undertaken to fulfill its responsibility by automatic termination of a father's parental rights, which is a prerequisite to any adoption,[9] and delegation of some of its responsibility to private regulated adoption agencies in finding appropriate substitute parents.[10]

children if the private entities were not engaged in that function.

**9.** *See* H. Clark, *Law of Domestic Relations*, § 18.1 at 602 (1968) (adoption requires that the legal rights and obligations of natural parents come to an end before similar rights and obligations can be vested in new adoptive parents).

**10.** Under Utah's statutory scheme, Family Services statutorily is required to prescribe rules and regulations for the manner in which private adoptive agencies are organized, financed, and administrated. Utah Code Ann. § 55–8a–4 (1986). Specifically, Family Services prescribes standards for the employment and performance of private adoption agency employees. Family Services also writes rules and regulations covering the general standards of practice, the records required to be kept, the use of homes to receive and care for children received by the agency and "any other matters deemed necessary to assure the competency and suitability of child placing agencies to place children." *Id.* Family Services is required to investigate all applicants for child placing agency status. § 55–8a–2. In addition, Family Services is also granted the authority to conduct investigations into agency compliance with its regulations once a license has been issued. Finally, the statute authorizes Family Services to hold license revocation or suspension proceedings upon notice. § 55–8a–3.

The conclusion we reach here that state action is present should not create a chill upon actions of private adoption agencies. This court does not rule that all actions and decisions by private adoption agencies will be subject to review under the constitution. Rather this court's holding is limited to the role of LDS Social Services and other private parties in triggering the state mandated result of § 78-30-4.[11] Where as here that role is limited as a conduit for the implementation of prior state decisions and policy it seems clear that no liability for damages could attach.

■ A final question is whether the absence of the state or some official thereof as a named party presents a defect here. We think not. The private parties and the named state judge are the only parties from whom requested injunctive relief could be obtained if the statute were to be declared unconstitutional.[12] In focusing upon the conduct that resulted in termination of plaintiff's parental rights, only three principal actors are involved: (1) the child's mother who relinquished all custody and control of the child; (2) LDS Social Services who received custody of the child, took applications from potential adoptive parents and delivered custody to the adoptive parents; and (3) John and Jane Doe who applied for adoption and received custody of the child from LDS Social Services. This court holds that in a judicial proceeding by a putative father for determination of his parental rights, the said actors should be deemed to be state actors for the limited purpose of challenging operation of the statute. The Utah Supreme Court appears to agree and implicitly has recognized that operation of § 78-30-4 involves state action in the context of a private adoption, even when the state or its officials are not formally joined as parties.[13] A similar recognition is found in cases from other jurisdictions and the United States Supreme Court.[14] In addition, it is clear

11. Accordingly, this court makes no finding of state action with regard to plaintiff's claim for damages against LDS Social Services. This court's holding is limited to operation of the statute and the plaintiff's request for return of custody. That recognition is consistent with the Utah Supreme Court's dicta in *Sanchez v. L.D.S. Social Services,* 680 P.2d 753, 755 n. 2 (Utah 1984) that a decision by L.D.S. Social Services not to inform a putative father of his duty under § 78-30-4 is not state action as well as the dissent in *In re Adoption of Baby Boy Doe,* 717 P.2d 686, 695 (Utah 1986) (Stewart, J. dissenting) that deception by the mother or other private parties as to when a child would be born is not state action. *See also In the Matter of Petition of Steve B.D.,* 112 Idaho 22, 730 P.2d 942, 947 (1986) (deception of mother as to child's custody was not state action).

12. It would be of little benefit to name state officers such as the attorney general because operation of the statute seemingly has no relationship to the responsibilities of such officials.

13. *See Wells v. Children's Aid Society of Utah,* 681 P.2d 199 (Utah 1984) (suit against private nonprofit adoption agency and the child's mother; reference in the editor's case summary to the defendant as a "state adoption agency" is incorrect); *Sanchez v. L.D.S. Social Services,* 680 P.2d 753 (Utah 1984) (suit against private nonprofit adoption agency); *Ellis v. Social Services Dept. of the Church of Jesus Christ of Latter-day Saints,* 615 P.2d 1250 (Utah 1980) (suit against private nonprofit adoption agency and the child's mother). *See also In re Adoption of Baby Boy Doe,* 717 P.2d 686 (Utah 1986) (allowing intervention by putative father in adoption proceeding to raise constitutionality of statute under Federal and State Constitutions); *In the Matter of K.B.E. and T.M.E.,* 740 P.2d 292 (Utah Ct.App.1987) (same).

14. *See In re Adoption of Martz,* 102 Misc.2d 102, 423 N.Y.S.2d 378 (1979), *aff'd, In re Adoption of Jessica "XX",* 77 A.D.2d 381, 434 N.Y.S.2d 772 (1980), *aff'd,* 54 N.Y.2d 417, 446 N.Y.S.2d 20, 430 N.E.2d 896 (1981), *aff'd, Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In *Lehr* the State of New York was allowed to intervene as a party but its presence seemingly was not a factor in finding that the conduct involved state action which could be tested in that particular lawsuit. If the state's ability to present argument is a factor in determining whether state action exists in this particular lawsuit, local rule of practice 6(b) is important because the State of Utah has been notified of the challenge to the statute here. At this point the state has not sought intervention. *See also In re David Andrew,* 56 A.D.2d 627, 391 N.Y.S.2d 846, *aff'd, In re David A.C.,* 43 N.Y.2d 708, 401 N.Y.S.2d 208, 372 N.E.2d 42 (1977), *rev'd, Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (appeal from adoption proceeding involving father and adoptive parents); *In re: Application of Randall Walcott for Adoption of Child, Adoption Case No. 8466,* (Ga.Super.Ct. July 12, 1976), *aff'd,* 238 Ga. 230, 232 S.E.2d 246 (1977), *aff'd, Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (appeal from adoption proceeding

that the requirement of state action is the same whether a case is brought in federal or state court.[15] We conclude that plaintiff has named the proper parties to test the constitutionality of the alleged "state" deprivation.

## II. *Abstention*

Defendants have requested that if this court finds jurisdiction to exist, nevertheless it should abstain from hearing the case and defer to the ongoing state adoption proceeding. In *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) the Supreme Court reviewed its prior cases and discussed the propriety of abstention. The court said:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair

to the state court would clearly serve an important countervailing interest." ... Our decisions have confined the circumstances appropriate for abstention to three several categories.

> (a) Abstention is appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." ... [*Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)]

> (b) Abstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public impact whose importance transcends the result in the case at bar. ... [*Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959)]

> (c) Finally, abstention is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings, *Younger* [*v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)] ... state nuisance proceedings antecedent to a criminal prosecution, which

---

involving father and adoptive parents). In *Quillion* the state appeared as *amicus curiae* before the Georgia Supreme Court. *See also In re the Matter of Baby Girl Eason*, 257 Ga. 292, 358 S.E.2d 459 (1987). In *Eason* the putative father filed a petition for legitimation of his biological child which was objected to by the child's mother, a child placement agency and prospective adoptive parents. The Georgia Supreme Court reached the federal constitutional question raised and said:

> But the relationship here between adopting parents and child did not take place in the absence of state participation. The adoption laws were being pursued through the courts and this accounts for the placement of the child with the adopting parents. The unwed father has a constitutionally protected interest which cannot be denied him through state action. Only the state can alter its decision to prevent the development of a parent-child relationship with adopting parents until the unwed father's rights are resolved. Thus we conclude if Scharlach has not abandoned his opportunity interest, the standard which must be used to determine his right to legitimate the child is his fitness as a parent to have

custody of the child. If he is fit he must prevail.

The court remanded for a factual determination involving the previously joined parties. *See also In the Matter of the Petition of Steve B.D.*, 112 Idaho 22, 730 P.2d 942 (1986) (proceeding involving the prospective adoptive parents and natural father; court reached federal constitutional question).

**15.** In *Lugar* the United States Supreme Court said:

> If a defendant debtor in state-court debt collection proceedings can successfully challenge, on federal due process grounds, the plaintiff creditor's resort to the procedures authorized by a state statute, it is difficult to understand why that same behavior by the state-court plaintiff should not provide a cause of action under § 1983. If the creditor-plaintiff violates the debtor-defendant's due process rights by seizing his property in accordance with statutory procedures, there is little or no reason to deny to the latter a cause of action under the federal statute, § 1983, designed to provide judicial redress for just such constitutional violations.

457 U.S. at 934, 102 S.Ct. at 2752.

are directed at obtaining the closure of places exhibiting obscene films, *Huffman [v. Pursue Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) ] ... or collection of state taxes.

*Id.* at 813–16, 96 S.Ct. at 1244–46.

■ After careful consideration, this court has determined that it is appropriate to exercise discretion by requiring resolution by the state courts of the questions here presented. This court is persuaded that this case falls within one or more of the exceptions explained in *Colorado River Water Conservation District* as well as the longstanding practice of abstention in domestic relations matters.

#### A. *Pullman Abstention*

With regard to the category of abstention involving possible mooting of the federal constitutional question, the Utah Supreme Court's opinion in *Wells v. Children's Aid Society of Utah*, 681 P.2d 199 (Utah 1984) is important. In that case the Utah court reviewed the Supreme Court's opinions in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) and in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The court then turned to the Utah Constitution and determined that under the Utah Constitution a putative father receives greater protection than was granted by the Supreme Court in *Lehr* under the federal constitution. *Id.* 681 P.2d at 206. Based upon that recognition plaintiff may be able to establish that as applied the Utah statute is violative of the greater protections of the state constitution, thereby mooting the federal constitutional question.

#### B. *Thibodaux Abstention*

This case also presents important questions of state law that bear upon policy issues of considerable importance to the State of Utah. The importance of the state interests in this case are born out by early

Supreme Court precedent dealing with the jurisdiction of federal district courts. In *In re Burrus*, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890) the court said:

> The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States. As to the right to the control and possession of this child, as it is contested by its father and its grandfather, it is one in regard to which neither the Congress of the United States nor any authority of the United States has any special jurisdiction.

*Id.* at 593–94, 10 S.Ct. at 853. Later authority has recognized that the theoretical underpinnings of such Supreme Court recognition is not complete lack of jurisdiction but rather strong policies of federal-state comity. *See Huynh Thi Anh v. Levi*, 586 F.2d 625, 632 (6th Cir.1978). Accordingly, federal courts ordinarily should defer to the state courts based upon the state's strong interest in domestic relations matters, the superior expertise of state courts in settling such disputes and the possibility of incompatible state and federal orders. *See Fay v. South Colonie Central School Dist.*, 802 F.2d 21, 31 (2nd Cir.1986); *Peterson v. Babbitt*, 708 F.2d 465, 466 (9th Cir. 1983); *Magaziner v. Montemuro*, 468 F.2d 782, 787 (3rd Cir.1972). Based upon the above policies, courts have been reluctant to get into custody disputes wherein private parties contest what is in the best interest of a child. *See Coats v. Woods*, 819 F.2d 236, 237 (9th Cir.1987); *Peterson v. Babbitt*, 708 F.2d 465, 466 (9th Cir.1983); *LaMontagne v. LaMontagne*, 394 F.Supp. 1159, 1160 (D.Mass.1975).

Admittedly this case goes beyond a mere private dispute over the best interests of a child and goes to the heart of Utah's statutory scheme. Plaintiff correctly points out that the Utah Supreme Court has upheld the facial validity of § 78–30–4.[16] How-

---

**16.** *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689 (Utah 1986); *Wells v. Children's Aid Society of Utah*, 681 P.2d 199, 206 (Utah 1984); *Sanchez v. L.D.S. Social Services*, 680 P.2d 753, 755 (Utah 1984); *Ellis v. Social Services Dept. of the*

*Church of Jesus Christ of Latter-day Saints*, 615 P.2d 1250, 1256 (Utah 1980). Plaintiff here contends that the most recent opinion, *In re Adoption of Baby Boy Doe*, so significantly alters the operation of the statute that it amounts to a

ever, the Supreme Court of Utah has defined an "impossibility" exception to the statute, and there is considerable reason to believe the Utah courts are interpreting § 78–30–4 in a way that will meet the federal constitutional questions raised here.[17]

The state's interests at stake here are great, and the Utah courts have evidenced a willingness to balance the interests of putative fathers in individual cases within the purview of a constitutional statute. This court considers that the Utah courts they ought to be given further opportunity to do so. In *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) the Supreme Court recognized as much:

> facial attack on the statute. At least one commentator agrees. *See* Note, *Termination of an Unwed Father's Parental Rights,* 1987 Utah L.Rev. 220, 221. For other commentary on the *In re Adoption of Baby Boy Doe* case *see* L. Wardle, *The Adoption Conundrum Part I,* 1987 Utah Lawyer Alert No. 4 at 4–8; L. Wardle, *The Adoption Conundrum Part II,* 1987 Utah Lawyer Alert No. 5 at 6–9; Note, *The Putative Fathers' Due Process Rights to Notice and a Hearing: In re Baby Boy Doe,* 1986 B.Y.U. L.Rev. 1081.

**17.** In *Ellis* the Utah Supreme Court first defined an impossibility exception under § 78–30–4. The court said that if it was "impossible for the father to file the required notice of paternity prior to the statutory bar, *through no fault of his own* ... and he came forward within a reasonable time after the baby's birth, he should be deemed to have complied with the statute." 615 P.2d at 1256 (emphasis added). In its most recent interpretation of the impossibility exception the Supreme Court overruled a specific finding of fact by the trial court that it was not "impossible" for the father to have complied with § 78–30–4. In so doing the court engaged in a factually specific analysis of the operation of the statute in terms of fairness to the particular father involved. The Utah Supreme Court said:

> [T]he standards enunciated in [our] cases were developed in recognition of the need to balance the competing interests in this type of case; the significant state interest in speedily placing infants for adoption and the constitutionally protected rights of putative fathers. *See Wells,* 681 P.2d at 202–03. In all but the most exceptional cases, the operation of section 78–3–04 achieves that balance as it affords putative fathers the opportunity to assert and protect their rights while providing a finite point at which the state's interest supercedes that of the father. However, where a father does not know of the need to protect his rights, there is no "reasonable opportunity" to assert or protect parental rights. In

The final concern prompted by broad facial attacks on state statutes is the threat to our federal system of government posed by "the needless obstruction to the domestic policy of the states by forestalling state action in construing and applying its own statutes."

⁘

State courts are the principal expositors of state law. *Almost every constitutional challenge—and particularly one as far ranging as that involved in this case—offers the opportunity for narrowing constructions that might obviate the constitutional problem and in-*

> such a case, the operation of the statute fails to achieve the desired balance and raises serious due process concerns. Although we have previously established that actual notice is not required prior to termination of parental rights under section 78–30–4(3), *Wells,* 681 P.2d at 207, that determination was based at least in part on the assumption that "[n]otice requirements may be satisfied when necessarily implied," *Ellis,* 615 P.2d at 1256, n. 16 (citation omitted), i.e., in the usual case where the putative father knows or should know of the birth and can reasonably take the timely action required to avoid the statutory bar. Under the circumstances of this case, however, including the clearly articulated intent of the father to keep and rear the child, the full knowledge of that intent on the part of all involved, the representations made by the mother, the actions of her family, the premature birth, and the non-residency of the father coupled with his absence at the time of birth, we cannot say that this was either a usual case or that notice may be implied. We therefore conclude that appellant has successfully shown "that the termination of his parental rights was contrary to basic notions of due process, and that he came forward within a reasonable time after the baby's birth, [such that] he should be deemed to have complied with the statute." *In re Adoption of Baby Boy Doe,* 717 P.2d at 691.

In an even more recent opinion the Utah Court of Appeals found a remand unnecessary to determine impossibility where a putative father filed a notice of paternity hours after a petition for adoption was filed. The court acknowledged that the father failed timely to file in accordance with the statute but held that in the circumstances application of the statute's bar would violate fundamental fairness. *In the Matter of K.B.E. and T.M.E.,* 740 P.2d 292, 296–97 (Utah Ct.App.1987). The court engaged in a balancing analysis apparently independent of a determination of impossibility.

*telligently mediate federal constitutional concerns and state interest.* When federal courts disrupt that process of mediation while interjecting themselves in such disputes, they prevent the informed evolution of state policy by state tribunals. . . . The price exacted in terms of comity would only be outweighed if state courts were not competent to adjudicate federal constitutional claims—a postulate we have repeatedly and emphatically rejected.

.    .    .    .    .

In sum, the only pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims and Texas law appears to raise no procedural barriers.

*Id.* at 430, 99 S.Ct. at 2380–81.

Under all of the circumstances this court is persuaded that under the doctrine of *Thibodaux* it should defer to the state courts to allow them to fulfill their duty to further Utah's policy in balancing the competing interests in adoption cases consistent with federal constitutional principles.

## C.  *Younger Abstention*

Under the *Younger* abstention doctrine a federal court will not grant injunctive or declaratory relief if the federal plaintiff is a party to a state criminal proceeding and the party can raise the constitutional issue in the state proceeding. *Younger* has been extended by the Supreme Court to civil contexts when the state is a party to a civil proceeding and the action is in aid of and closely related to criminal statutes. *See Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371,

60 L.Ed.2d 994 (1979) (involving state statute authorizing temporary removal of child in child abuse context).  In this case plaintiff seeks to enjoin the ongoing adoption proceeding and thus *Younger's* recognized policy of noninterference applies.  However, application of *Younger* to the facts of this case would require extension of the principle in two respects: (1) here the plaintiff in the federal proceeding is not a party to the ongoing adoption proceeding; and (2) the State of Utah is not a directly named party in the adoption proceeding.[18]  Accordingly, this court finds it unnecessary to rely on *Younger* abstention because we have found that *Thibodaux* abstention here applies.

Despite nonreliance on *Younger,* this court recognizes that for any principle of abstention to apply it is necessary that the plaintiff have an avenue available in state court.  In this case the statute, § 78-30-4, provides that plaintiff's failure to file a notice of paternity prior to the time his child was placed with L.D.S. Social Services bars him "from thereafter bringing or maintaining any action to establish his paternity of the child."  However, defendants point out that through intervention in the adoption proceeding or through filing a habeas corpus petition putative fathers have obtained state court review of the constitutionality of § 78-30-4 as applied to them.[19]  The court also notes that ultimate recourse to federal court from an adverse state court decision is not cut off.[20]  In all events, this court in finding abstention to be appropriate assumes that plaintiff will

---

**18.** Some courts do not require that the State be a direct party so long as significant state interests are involved.  Under that view the state adoption proceeding would seem to meet the test.  This is an unsettled area of the law, however.  *See Etlin v. Robb,* 458 U.S. 1112, 102 S.Ct. 3496, 73 L.Ed.2d 1375 (1982) (White, J. dissenting from denial of certiorari, joined by Brennan, J. on basis that whether *Younger* applies to a private dispute (in *Robb* a custody dispute) is a question that needs to be finally resolved by the Supreme Court).

**19.** *See In re Adoption of Baby Boy Doe,* 717 P.2d 686 (Utah 1986); *Ellis v. Social Services of the*

*Church of Jesus Christ of Latter-day Saints,* 615 P.2d 1250 (Utah 1980); *In the Matter of K.B.E and T.M.E.,* 740 P.2d 292 (Utah Ct.App.1987).

**20.** If plaintiff challenges § 78-30-4 in state court and the court upholds the statute, plaintiff will have a right of appeal to the United States Supreme Court.  *See* 28 U.S.C. § 1257(2).  The Court's appellate jurisdiction is nondiscretionary although the Court need not give the case plenary review.  *See Hicks v. Miranda,* 422 U.S. 332, 343–44, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975).

have an adequate opportunity for review in state court.[21]

Based upon the above analysis, plaintiff's motion for preliminary injunction is denied and defendant's Motion to Dismiss is granted without prejudice to resolution of the matter in the state courts of Utah. This Memorandum Decision and Order will suffice as the court's final action on this motion; no further Order need be prepared by counsel.

---

**21.** If after diligent effort by plaintiff, and cooperation from the defendants, plaintiff is unable to obtain review in the state courts of Utah this court will be required to exercise its jurisdic-tion. *See Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 30–31, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959).