Steven H. SWAYNE, Plaintiff
and Appellant,

v.

L.D.S. SOCIAL SERVICES, John Doe
and Jane Doe, Defendants and
Respondents.

No. 880177–CA.

Court of Appeals of Utah.

Sept. 15, 1988.

M. David Eckersley (argued), Prince, Yeates & Geldzahler, and Billy L. Walker, Jr., Salt Lake City, for plaintiff and appellant.

David M. McConkie, Merrill Nelson (argued), Kirton, McConkie & Bushnell, Salt Lake City, for defendants and respondents.

Before BENCH, GARFF and JACKSON, JJ.

## OPINION

GARFF, Judge:

Appellant Steven Swayne appeals an order denying him custody of his illegitimate

child and seeks attorney fees under 42 U.S.C. § 1988 on the ground that Utah Code Ann. § 78-30-4 (1987) unconstitutionally deprived him of his parental rights. We reverse in part and affirm in part.

Appellant and the mother, P., are the unwed parents of the child whose custody is at issue. Appellant and P. began dating and having sexual relations in late 1985.

While they were dating, P. supported appellant by allowing him to use her car and by giving him money for his apartment rent and other expenses. During this period of time, appellant was also dating and having sexual relations with other women. Prior to dating P., appellant had fathered another child out of wedlock, who was born in February 1986. Appellant signed papers consenting to that child's adoption on February 9, 1986.

Appellant became aware of the pregnancy in October 1986. He initially became angry, denying that the baby was his. However, in April 1987, he informed members of his family that he was the father of the child. His family then held a baby shower for P. Appellant also approached his sister about raising the child until such time as he became "more stable."

During the pregnancy, appellant and P. resided in Salt Lake County but did not live together. Prior to the baby's birth, appellant indicated that he did not intend to marry anybody, including P., because "it didn't appeal" to him. He suggested to P. that if she decided to keep the baby, she could live with his mother so long as she supported herself and paid half of the rent. He never offered to live with her and the baby as a family unit. However, after P. relinquished the baby, appellant then offered to marry her "on paper" because it "would make the baby legitimate." He told P. that they did not have to live together and that she would not need to tell her parents, but that such an arrangement would make their legal case better.

P. informed appellant in March 1987 that her parents wanted her to relinquish the baby for adoption. Appellant responded that adoption should be P.'s decision, and that if she did not want the baby she could give it to him.

In March 1987, P. made an appointment with respondent, L.D.S. Social Services,[1] to discuss placing the baby for adoption, but did not keep the appointment because she was undecided as to what to do. Although she had considered keeping the baby and living with appellant's mother, she was uncertain that she would be able to meet the financial requirements for that arrangement.

P. gave birth to a daughter on June 4, 1987. Appellant was present in the delivery room during the birth and visited with P. and the child during the two days they were in the hospital.

Appellant was not present in the hospital room when the nurse filled out the birth certificate and informed P. that appellant had to sign an acknowledgment of paternity form in front of a notary public to have his name entered as the father on the baby's birth certificate. When appellant later visited P., she had the form in her hospital room and informed him that he had to sign it. He did not sign it. Consequently, the birth certificate does not indicate the identity of the father.

Later, appellant denied ever having seen the acknowledgment form, but stated that he had told P. he wanted to put his name on the birth certificate. He admitted, however, that he knew he was supposed to sign something in the hospital to get his name on the birth certificate.

On Saturday, June 6, 1987, P. was discharged from the hospital. P.'s mother assumed financial responsibility and took P. and the baby to her home. Appellant did not pay any of the hospital bills but did eventually pay $45 toward the obstetrician's bill.

1. L.D.S. Social Services was licensed during the relevant time period by the State of Utah as a qualified child placement agency pursuant to Utah Code Ann. § 55-8a-1 (1984) (repealed 1988), but receives no governmental funding and has no governmental agency or entity involved in its internal operation, affairs, or decisions except as expressly authorized by the licensing statute.

P.'s mother made an appointment with respondent for June 8, 1987, so that P. could discuss placing the baby for adoption.

On June 8, P. brought the baby to appellant's apartment for a visit. She did not inform him that she was planning to place the baby for adoption. The same day, P. and her parents took the baby to respondent where a counselor explained the adoption process to them. During this meeting, P. told the counselor that appellant had no interest in marriage nor in living with and supporting her and the baby.

The counselor told P. that the decision to place the baby for adoption was hers alone to make and that if she was not sure, she could place the baby in temporary foster care until she decided. P. decided that it was in the baby's best interest to place her for adoption. She then signed an affidavit and release relinquishing custody of the baby to respondent to place her for adoption, stating that she was doing this of her own free will and choice, and that she understood what she was doing.[2]

During the meeting, the counselor telephoned the Bureau of Vital Statistics of the Utah Department of Health and inquired whether an acknowledgment of paternity had been filed for the child. She was informed that one had not been filed. Because it was late in the day, the counselor permitted P. to take the baby home that night and bring her back the following day.

On June 9, P. and the baby visited appellant at his apartment. She did not inform him of the relinquishment, but told him that she was going to California and was taking the baby with her. She testified that she was afraid to tell him about the relinquishment because of his recent interest in the child, his potential retaliation against her family, and because he was upset that she was going to California. At 5:00 that afternoon, P. gave custody of the baby to respondent and left for California the following day, June 10. During this trip, she called appellant each day and pretended that she had the child with her.

Respondent transferred custody of the baby to the adoptive parents on June 12, 1987. The child has resided with the adoptive parents ever since.

On June 13, P. called appellant's family and, because she was afraid to tell appellant the truth, told them that the baby was dead. Appellant's mother called the hospital in California to see if it had any record of the baby and discovered the deception. When appellant called P. back, she admitted her deception, informed appellant of the adoption, and agreed to return to Salt Lake City to help him attempt to gain custody of the child.

On June 15, appellant filed an acknowledgment of paternity with the Registrar of Vital Statistics. He and P. filed an affidavit to amend the child's birth certificate to add his name as the father and to give the child his last name. They then went to respondent to ask for the child, but were advised by the counselor that it was too late, the child had already been placed with adoptive parents, and that they would have to contact their lawyers.

On June 29, appellant brought suit under 42 U.S.C. § 1983 in Federal District Court, requesting custody of the child. Judge J. Thomas Greene found that the federal court had jurisdiction over the case because state action was present and the persons involved in the adoption were state actors. However, at respondent's request, Judge Greene elected to abstain to allow the state courts to interpret section 78–30–4, dismissing the case on September 3, 1987.

---

**2.** P. later testified that she was emotionally unstable at the time because she was concerned over appellant's lack of commitment to her and because of parental pressure in that her parents had told her that she could have no contact with her family if she kept the baby. She also stated that she did not tell the counselor much about her relationship with appellant because her parents, who did not like him, were in the room with her. However, P., "[a]fter considering all the circumstances, such as Steven's lack of interest in me and the baby, my inability to support and rear the baby alone, the problems of bringing a ... baby into a possible marriage with another man, and the need of the baby to have a good home," chose to relinquish the baby. Her articulated reasons for relinquishing indicate that, despite the emotional turmoil she was going through, she had thought out and deliberately made an uncoerced decision.

Appellant then filed this state court action on September 7, 1987. On September 24, 1987, he filed a motion for a preliminary injunction prohibiting respondent from continuing to deny him custody of the child during the pendency of the state action.

On December 31, 1987, after an evidentiary hearing, the trial judge denied appellant's motion, specifically finding that: (1) "it was not impossible for [appellant] to have filed his notice of claim of paternity prior to the date the child was relinquished for adoption"; (2) appellant, throughout P.'s pregnancy, "did not behave in a manner consistent with that of a concerned, committed father, nor did he clearly articulate an intent or desire to assume the responsibilities of parenthood or to keep and rear the child"; and (3) appellant, if awarded custody of the child, would relinquish her to his sister to care for, rather than caring for her himself.

On February 24, 1988, respondent moved for summary judgment.

A hearing on this motion was held on March 4, 1988. The court granted respondent's motion for summary judgment, dismissed appellant's action, and awarded costs to respondent, finding that: (1) there was no genuine issue as to any material fact; (2) respondent's acts did not constitute state action; and (3) section 78–30–4 was valid on its face and as applied under the due process and equal protection provisions of the Utah and United States Constitutions.

On March 15, 1988, appellant filed a notice of appeal before this Court. His appeal raises the following issues: (1) Did respondent's conduct constitute sufficient "state action" to invoke constitutional protections? (2) If so, does section 78–30–4, as applied to the facts in this case, violate the equal protection provisions of the fourteenth amendment to the United States Constitution and article I, section 24 of the Utah Constitution, or the due process provisions of the first and fourteenth amendments to the United States Constitution and article I, section 7 of the Utah Constitution? (3) Does section 78–30–4 violate the provisions of article I, section 11 of the Utah Constitution?

## STATE ACTION

■ The fourteenth amendment guarantees of equal protection and due process apply "only if the deprivation of life, liberty, or property is by governmental 'state action' rather than by purely private action." *Swayne v. L.D.S. Social Servs.*, 670 F.Supp. 1537, 1540 (D.Utah 1987). This case involves the termination of appellant's parental rights, a liberty interest which has repeatedly been recognized as worthy of constitutional protection by the United States Supreme Court. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972).

The United States Supreme Court, in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), delineated a two-prong test for determining whether state action was involved in a deprivation: (1) the deprivation must be caused by the exercise of a state-created right or privilege, and (2) the party charged with the deprivation must be a person who may fairly be said to be a state actor. *Id.* at 941, 102 S.Ct. at 2755; *accord Dirks v. Cornwell*, 754 P.2d 946, 950 (Utah Ct.App. 1988). Respondent argues that its conduct in placing the baby for adoption did not constitute state action because the adoptive placement of children is not the exclusive prerogative of the state, so is not a state-created right or privilege. Further, because respondent receives no state funding and has no governmental control over its internal affairs, it is not a state actor. However, this argument sidesteps the real issue, whether respondent may be considered to be a state actor in terminating appellant's parental rights through the operation of section 78–30–4, rather than in placing appellant's child for adoption.

Prior Utah cases interpreting section 78–30–4, although not explicitly addressing this state action issue, assume the existence of state action in the operation of this statute. For example, the Utah Supreme Court, in *Wells v. Children's Aid Society of Utah*, 681 P.2d 199, 206 (Utah 1984)

(quoting *In re Boyer*, 636 P.2d 1085, 1087–88 (Utah 1981)), stated that "[w]hen state action impinges on fundamental rights, due process requires standards which clearly define the scope of permissible conduct so as to avoid unwarranted intrusion on those rights."

We, therefore, concur with the finding of the United States District Court in *Swayne*, that state action indeed existed in the present circumstances, because (1) "[u]ndoubtedly, the State was responsible for the statute"; *Swayne*, 670 F.Supp. at 1541 (quoting *Lugar*, 457 U.S. at 938, 102 S.Ct. at 2754); and (2) the statute involved is self-operative and mandates the termination of appellant's parental rights. *Id.* As Judge Greene explained:

> The State of Utah, not a private party, has made an official policy decision that any time custody of an illegitimate child is relinquished by the mother, the father's parental rights will be automatically cut off unless a notice of paternity previously has been filed by the biological father. That state decision to terminate the father's parental rights is implemented through the actor or actors who accept the child for placement, whether a state entity, a private licensed adoption agency, or any other person, for example an attorney. It would be a total fiction to allow the state to remove itself from *its decision* to cut off parental rights simply because a private party triggers operation of the statute. The only fair conclusion is that such a private party becomes a "state actor" when his or her actions bring the statute into play so as to effectuate the pre-determined state decision to terminate parental rights.

*Id.* at 1541–42 (emphasis in original). Judge Greene also noted that even though a private party may deprive a parent of the physical custody of his child, only the state may irrevocably sever all parental rights. Thus, state action is present in the operation of section 78–30–4. *Id.* at 1542.

In view of this determination, we reverse the lower court's finding that state action did not exist. Because we have determined state action does exist in the operation of section 78–30–4, the question becomes whether this state action has deprived appellant of his constitutional rights.

## EQUAL PROTECTION

■ Appellant first argues that section 78–30–4, as applied to these facts, violates his constitutional right to equal protection under the United States Constitution. He asserts that the similarly situated parents of an illegitimate child are given different legal rights solely on the basis of their sex since the mother's consent is required prior to any adoption of the child regardless of whether she is willing to fulfill her parental responsibilities while the father has the right to consent to the child's adoption only if he files an acknowledgment of paternity indicating his willingness and intent to support the child pursuant to section 78–30–4.

"The essence of equal protection is that legislative classifications resulting in differing treatment for different persons must be based on actual differences that are reasonably related to the legitimate purposes of the legislation." *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 887 (Utah 1988). Although appellant recognizes the legitimacy of the purposes of section 78–30–4, which are to speedily identify those persons who will assume the parental role over illegitimate children and to facilitate immediate and continuing physical care of and emotional bonding opportunities for such children, *Wells*, 681 P.2d at 204, he alleges that the classifications of section 78–30–4 are based on differences that are not reasonably related to these purposes. He first states that the statute defeats its objective by failing to require the mother of an illegitimate child to take action to identify herself as a willing parent as fathers are required to do since an unfit and indifferent mother can prevent the adoption of her child and, thus, fail to provide appropriate physical care and emotional bonding opportunities for the child. He then states that the statutory objective is also defeated because it results in gender-based discrimination against "identified, present, and willing fathers" who would, in fact, provide the necessary care and bonding opportunities for

the child, and that an indifferent mother can arbitrarily deprive such a father of his parental rights under the statute.

The Utah Supreme Court, in *Ellis v. Social Services Department of the Church of Jesus Christ of Latter-day Saints*, 615 P.2d 1250 (Utah 1980), has held that section 78–30–4 does not, on its face, violate the equal protection rights of an unwed father because the father's parental rights are the same as the mother's and the same as if the child had been born legitimate, providing he timely files his acknowledgment of paternity pursuant to the statute. Where the father fails to come forward by timely filing an acknowledgment of paternity or by developing a substantial relationship with the child, the equal protection clause does not preclude the state from terminating his parental rights. *Caban v. Mohammed*, 441 U.S. 380, 394, 99 S.Ct. 1760, 1769, 60 L.Ed.2d 297 (1979).

In *Wells*, the Utah Supreme Court reaffirmed *Ellis*, finding that there are reasonable bases for statutory differentiation between unwed mothers and fathers and between fathers who file an acknowledgment of paternity and those who do not. *Wells*, 681 P.2d at 204. The court also found that these classifications are reasonably calculated to serve the proper governmental objectives of (1) promptly identifying those fathers who will acknowledge parental responsibilities, and (2) speedily making children available for adoption. *Id.* The *Wells* court, although recognizing that many unwed fathers are unidentified and uninterested, stated that:

> fathers who have "fulfilled a parental role over a considerable period of time are entitled to a high degree of protection," whereas unwed fathers "whose relationships to their children are merely biological or very attenuated" are entitled to a lesser degree of protection. .... "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the due process clause.... *But the mere existence of a biological*

*link does not merit equivalent constitutional protection."*

*Id.* at 203 (quoting *In re J.P.*, 648 P.2d 1364, 1375 (Utah 1982) and *Lehr v. Robertson*, 463 U.S. 248, 261–62, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983)) (emphasis in original).

■ On the other hand, unlike unwed fathers, unwed mothers are "automatically identified by virtue of their role in the process of birth." *Wells*, 681 P.2d at 203. However, if shown to be an unfit or indifferent parent on account of cruelty, neglect, or desertion of the child, a mother may have her parental rights judicially terminated and the child put up for adoption without her consent pursuant to section 78–30–4(1). Her parental rights will be terminated if she is shown to be unwilling to fulfill her parental responsibilities.

Thus, appellant's argument that the statutory classifications are based on gender differences that are not reasonably related to the statutory purposes fails.

■ Appellant next argues that we should not follow the Utah Supreme Court's reasoning in *Ellis* because, as he asserts, that opinion was based upon inherently contradictory statutory provisions found in sections 78–30–4 and 78–30–12. He argues that the protection afforded unwed fathers under section 78–30–12 is illusory because a father who has publicly acknowledged his child may lose his parental rights anyway by failing to file under section 78–30–4.

In *In the Matter of the Adoption of T.R.F. v. Felan*, 760 P.2d 906 (Utah Ct.App. 1988), this Court recently rejected this argument, holding that these two statutes are not inconsistent but operate independently in the appropriate factual contexts:

> We interpret the statutes [sections 78–30–4 and 78–30–12] as follows: when the unwed father acknowledges his child, within the meaning of the acknowledgment statute [section 78–30–12], prior to the mother's relinquishment of the child or prior to the filing of the petition for adoption, then the father need not comply with the requirements of the paterni-

ty statute [section 78–30–4]. However, if the claimed acts of acknowledgment occur *after* the mother's relinquishment or after the petition for adoption has been filed, then the paternity statute [section 78–30–4] governs.

*Id.* at p. 910. Thus, contrary to appellant's argument, the protections offered the unwed father under section 78–30–12 are not illusory because section 78–30–4 does not apply to him if he has fulfilled the adoption by acknowledgment requirements. He is protected under both sections.

■ If an unwed father establishes a substantial relationship over a number of years with his children, his rights cannot be extinguished without his consent under section 78–30–12. *Ellis,* 615 P.2d at 1255. Similarly, a caring, involved unwed father may file pursuant to section 78–30–4 even before such a substantial relationship has developed to acquire the same rights. The unwed mother cannot, then, arbitrarily divest him of parental rights and the unwed father has the same rights to consent to the adoption of his child as the mother.

■ Although appellant argues that section 78–30–4 violates his constitutional right to equal protection as applied, he raises no discernable argument on facts unique to this case: He failed to file an acknowledgement of paternity prior to the relinquishment of the child, and failed to communicate concern for and interest in the child apart from his few visits with her. He did not come forth after the birth of the child to assert his claim to paternity nor did he agree to support the child. He denied paternity for the major part of the pregnancy and, even after admitting paternity, never indicated to the mother or to anyone else any desire to marry her, to live together with her and the child, or even to personally raise the child. As such, it is not unjust for him to be classified with other similarly situated unwed fathers who have lost their parental rights by not coming forward to acknowledge their parental responsibilities.

■ Appellant's fourth argument is that section 78–30–4 violates the equal protection provisions of the Utah Constitution. "As a general rule, we will not engage in state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed." *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988). Because appellant has not set forth a separate state constitutional analysis in his brief, we do not respond to this argument. Merely stating that the statute violates the Utah Constitution without arguing the specific conflicts is not sufficient. We find that appellant's equal protection argument fails.

### DUE PROCESS

Appellant asserts that section 78–30–4 violates the due process clauses of the United States and Utah Constitutions. He argues that the statute operates to terminate an unwed father's parental rights before any adjudication of abandonment occurs, thus making failure to file an acknowledgment of paternity an irrebuttable presumption that he has abandoned his child. Relying on *Stanley v. Illinois,* 405 U.S. 645, 657, 92 S.Ct. 1208, 1215, 31 L.Ed. 2d 551 (1971), which states that procedures cannot stand which "explicitly [disdain] present realities in deference to past formalities," [3] he asserts that the statute violates due process because the fact presumed, abandonment, does not follow from his actual behavior in that he visited the child daily for the four days following the child's birth, invited his family to visit her, publicly acknowledged his paternity, and never clearly expressed an intention to relinquish his parental rights.

---

**3.** *Stanley* is inapposite to this case because of distinguishable facts: Peter Stanley was deprived of his children with whom he had lived and had raised for eighteen years. Upon the death of the children's mother, they were placed with court-appointed guardians pursuant to an Illinois statute which required that children of unwed fathers become wards of the state upon the death of their mothers. *Stanley,* 405 U.S. at 646, 92 S.Ct. at 1210. The Court found this statute to be unconstitutional because it created an irrebuttable presumption that unwed fathers were unfit parents. In the present case, appellant has not developed a comparable substantial relationship with his child.

This argument is, essentially, an attack on the constitutionality of the statute. The Utah Supreme Court has already settled this issue in *Wells*. Applying an even more stringent standard of review than required under the United States Constitution because of the fundamental nature of parental rights, the *Wells* court determined that section 78–30–4 is facially valid under the due process clause of the Utah Constitution because (1) the state has a compelling interest in speedily identifying those persons who will assume a parental role over newborn illegitimate children, and (2) the statute is narrowly tailored to achieve these purposes because there is no infringement of the unwed father's rights not essential to the statute's purposes. *Wells*, 681 P.2d at 206–07.

■ Further, appellant misconstrues the import of the statute. Because of his unwed status, he does not have parental rights subject to termination until he asserts them by either filing an acknowledgment of paternity pursuant to section 78–30–4 or by establishing a substantial relationship with the child pursuant to section 78–30–12. If he does either of the above, he preserves his parental rights. If he fails to come forward, he has no parental rights to abandon. The statute cannot create an irrebuttable presumption of abandonment where parental rights do not exist.

The Utah Supreme Court has stated that the nature of this subject matter makes a firm cutoff date reasonable, if not essential, because of the disruption to the children involved by the protracted litigation that a contrary holding would produce. *Sanchez v. L.D.S. Social Services*, 680 P.2d 753, 755–56 (Utah 1984). Further, marriage is the institution established by society for the procreation and rearing of children, and because of the disproportionate number of social problems involving illegitimate children, it is not

> too harsh to require that those responsible for bringing children into the world outside the established institution of marriage should be required either to comply with those statutes that accord

them the opportunity to assert their parental rights or to yield to the method established by society to raise children in a manner best suited to promote their welfare.

*Id.* at 756; *see also Lehr*, 463 U.S. at 263, 103 S.Ct. at 2994.

■ Appellant also argues that section 78–30–4, as applied, violates his due process rights. The Utah Supreme Court has recognized that situations may arise in which it is impossible, through no fault of his own, for an unwed father to file the required notice of paternity prior to the statutory bar. *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689 (Utah 1986); *Ellis*, 615 P.2d at 1256. In such a situation, due process requires that the unwed father be permitted to show that he was not afforded a reasonable opportunity to comply with the statute. If the father successfully shows that termination of his parental rights is contrary to basic notions of due process and if he comes forward within a reasonable time after the baby's birth, he is deemed to have complied with the statute. *Ellis*, 615 P.2d at 1256.

Such situations existed in *Ellis* and in *Baby Boy Doe*. In *Ellis*, the child's mother and father resided in California. The mother left California just prior to the child's birth without advising the father as to where the birth was to occur. When the child was born, she declared the father to be unknown, and relinquished the child four days later. The court found that the father was entitled to an opportunity to show, as a factual matter, that he could not reasonably have expected his baby to be born in Utah. *Id.* at 1256.

Likewise, in *Baby Boy Doe*, the father was not a Utah resident and had spent less than a week in the state. Prior to the baby's birth, the mother had told the father that she would move to Arizona with him, thus alleviating any concern he might have had about a potential adoption. The father then travelled to Arizona, found employment and a place to live, and moved the couple's belongings from California to Arizona. Because all parties were aware of the father's intent and desire to raise the

child, the mother's family deliberately withheld information about the child's birth to avoid his obstruction of the adoption. The baby was born early while the father was travelling from California to Arizona. Consequently, the father was unaware of the birth for three days, and only became aware of it one day after the petition for adoption had been filed. This father successfully showed that the termination of his parental rights was contrary to the basic notions of due process and that he came forward within a reasonable time after the baby's birth. Thus, the court deemed him to have complied with the statute. *Baby Boy Doe*, 717 P.2d at 690–91.

This "impossibility" exception is inapplicable, however, in cases which do not involve situations where it is impossible for the father to file the required notice through no fault of his own. *Wells*, 681 P.2d at 207.

The *Wells* court found that no impossibility existed under the following facts: The birth occurred in the same state as the father's residence. Neither the child's mother nor the adoption agency were involved in an effort to prevent the father from learning of the birth or from asserting his parental rights. Neither knew at the time of the relinquishment that the father was seeking to assert his parental rights. The father had advance notice of the expected time of the birth and the fact that the mother intended to relinquish the child for adoption. Further, the father had advice of counsel on filing the required form, and had a copy of the form provided by a social worker. *Id.* at 207–08.

Likewise, in *Sanchez v. L.D.S. Social Services*, the court determined that section 78–30–4 was not unconstitutionally applied: Both parents were Utah residents. Prior to the birth, the mother had told the father she would not live with nor marry him and that she was considering adoption. Together, the couple attended a counseling session at the agency which later took custody of the child for adoption. The father visited the mother and child in the hospital prior to the time the child was relinquished. On the day the child was relinquished, the

mother called the father and told him to come to the hospital if he wanted to see the baby one last time. When the father went to the hospital, he did not protest the mother's decision to place the child for adoption, but did attempt to sign the birth certificate. He then filed a notice of paternity after the baby was relinquished for adoption. *Baby Boy Doe*, 717 P.2d at 690; *Sanchez*, 680 P.2d at 75.

In the present situation, both appellant and P. were residents of Salt Lake County at the time the child was born. Appellant was aware of the time and location of the child's birth. As in *Sanchez*, no one had attempted to withhold from appellant any information regarding the child's birth. Appellant had made it clear to P. prior to the child's birth that he was not going to marry her, live with her, or assume any financial responsibility for her or for the baby. As in *Sanchez*, appellant was present at the birth and visited P. and the child in the hospital. Appellant knew of the possibility of the child's adoption from March 1987 when P. told him that her parents wanted her to relinquish the child. He told her that adoption should be her decision. At the hospital, appellant was instructed by P. that he had to sign an acknowledgment of paternity to appear as the father on the child's birth certificate, but did not sign it. P. signed the relinquishment on June 8th, four days after the child was born, and surrendered custody on June 9th. Although reprehensible, P.'s attempt to mislead appellant about the relinquishment by telling him that she had taken the child to California and that the child had died was irrelevant because it came after the fact.

Appellant had every reasonable opportunity to register prior to the act of relinquishment. He also had actual knowledge of the requirement to register, not only from P.'s informing him of this necessity at the hospital, but also because he, himself, had relinquished his rights to a previous child a year earlier.

These facts more closely resemble those in *Wells* and *Sanchez*, in which the impossibility exception was inapplicable, than those in *Ellis* and *Baby Boy Doe*. We

concur with the trial court and find that appellant had an opportunity to file his acknowledgment of paternity, and that it was not impossible for him to do so prior to the relinquishment through no fault of his own. As the *Sanchez* court stated, "[i]t is of no constitutional importance that the father came close to complying with the statute." *Sanchez*, 680 P.2d at 755. We, therefore, hold that section 78–30–4 was not unconstitutionally applied to appellant.

### OPEN COURTS

Finally, appellant raises the issue of whether section 78–30–4 violates the open court provision in article I, section 11 of the Utah Constitution. Appellant did not raise this issue below, but first raised it on appeal to this court. As a general rule, we do not consider issues raised for the first time on appeal, so decline to address this issue. *Rekward v. Industrial Comm'n,* 755 P.2d 166, 168 (Utah Ct.App.1988); *James v. Preston,* 746 P.2d 799, 801 (Utah Ct.App. 1987).

We affirm in part and reverse in part. We reverse the trial court's ruling concerning state action, but affirm the order denying appellant custody of the child. Because appellant is not the prevailing party, we do not address the issue of attorney fees under 42 U.S.C. § 1988. Each party is to bear its own costs on appeal.

BENCH and JACKSON, JJ., concur.