Steven H. SWAYNE, Plaintiff, Petitioner, and Cross–Respondent,

v.

L.D.S. SOCIAL SERVICES, John Doe and Jane Doe, Defendants, Respondents, and Cross–Petitioners.

No. 880384.

Supreme Court of Utah.

June 11, 1990.

Rehearing Denied July 13, 1990.

M. David Eckersley, Billy L. Walker, Jr., Salt Lake City, for plaintiff, petitioner and cross-respondent.

David M. McConkie, Merrill F. Nelson, Salt Lake City, for defendants, respondents and cross petitioners.

ON CERTIORARI TO THE UTAH
COURT OF APPEALS

HALL, Chief Justice:

Plaintiff Steven Swayne challenges the constitutionality of Utah Code Ann. § 78-30-4(3) (1981), which terminates the parental rights of the father of an illegitimate child if the father fails to file a timely notice of paternity. Defendant L.D.S. Social Services seeks review of the Utah Court of Appeals decision holding that its acts constituted state, rather than private, action.

Plaintiff and a friend, Penny, began dating and engaging in sexual intercourse in 1985. In September 1986, Penny discovered she was pregnant. When plaintiff learned of Penny's pregnancy, he was shocked, upset, and confused and initially denied that he was the father of the expected child. In the last trimester of Penny's pregnancy, however, he orally acknowledged his paternity. His family held a shower to acquire gifts for the baby, and plaintiff eventually made a small payment toward Penny's doctor bill.

Plaintiff and Penny both resided in Salt Lake County immediately before and during the pregnancy. They did not live together, however, and plaintiff dated other women during Penny's pregnancy and engaged in sexual relations with them. He indicated that it was not his intention to marry Penny or live with her and the child as a family, although he did arrange for Penny to move into his mother's apartment conditioned on Penny's supporting herself and paying half the rent. Plaintiff's sister offered to care for the child while Penny was at work.

In March 1987, Penny told plaintiff that her parents wanted her to relinquish the child for adoption. Plaintiff protested and indicated that adoption was plaintiff's and Penny's decision and that if she did not want the child, she should give it to him.

The child was born on June 4, 1987. Plaintiff was present in the delivery room and visited Penny and the child every day they were in the hospital. During Penny's recovery, a hospital clerk told her that in order to have plaintiff's name appear on the birth certificate, it was necessary for him to sign a form before a notary. When plaintiff visited Penny, she told him about the form, but he did not see fit to sign it. Both plaintiff and Penny now claim that they were unaware that the form was for the purpose of registering a claim of paternity, requiring plaintiff's signature to preserve his parental rights.

On June 6, 1987, Penny was discharged from the hospital. On the late afternoon of June 8, at the instigation and in the company of her parents, she met with defendant L.D.S. Social Services to discuss placing the child for adoption. During that meeting, a counselor phoned the Utah Department of Health and found that plaintiff had not filed a notice of claim of paternity. The counselor explained to Penny that the decision to place the baby for adoption was hers alone. Penny said that she would sign papers relinquishing her parental rights, but not that evening. The counselor indicated that it was best to sign the papers then, before plaintiff had an opportunity to file paternity. Penny signed relinquishment papers that evening, June 8, 1987. Although she later claimed she was pressured,[1] the document she signed indicates that her relinquishment was voluntary and not coerced.

Plaintiff filed a notice of claim of paternity on the first day possible after discovering Penny's relinquishment.[2] In June 1987, plaintiff brought suit in federal district court, seeking custody of the child. The federal court held that defendant's acts constituted state, rather than private, action, thus invoking plaintiff's rights to due process and equal protection of the

1. *See Swayne v. L.D.S. Social Servs.,* 761 P.2d 932, 935 n. 2 (Utah Ct.App.1988).

2. The record shows that rather than revealing she had given the child up for adoption, Penny told plaintiff that she was taking the baby to California. From California, she called plain-

tiff's family and told them that the baby had died. These facts are irrelevant since events subsequent to Penny's relinquishment of the child have nothing to do with the issues before this court. *See Swayne,* 761 P.2d at 935, 941.

laws, but abstained from considering the constitutionality of section 78–30–4, electing to allow state court review of that issue.[3]

Plaintiff filed an action in state court in September 1987. The trial court granted defendant's motion for summary judgment, finding that (1) there was no genuine issue as to any material fact, (2) defendant's acts did not constitute state action, and (3) section 78–30–4 was constitutionally valid on its face and as applied to plaintiff. In March 1988, plaintiff filed an appeal before the Utah Court of Appeals. That court reversed in part, holding that defendant's acts constituted state action, and affirmed in part, holding that section 78–30–4 was constitutionally valid on its face and as applied to plaintiff.[4]

## I. STATE ACTION

■ The fourteenth amendment to the United States Constitution states in part: *"No state* shall make or enforce any law which shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.) The termination of parental rights is the deprivation of a liberty interest worthy of constitutional protection.[5] These protections, however, are only affected if the deprivation of the interest is the result of state, rather than private, action.[6]

■ The general test for determining whether state action is involved in a deprivation was cited by both the federal district court and the Utah Court of Appeals. First, the deprivation must be caused by the exercise of a state-created right or privilege. Second, the party charged with the deprivation must be a person who may

fairly be said to be a state actor.[7] The first portion of the state action test is fulfilled since plaintiff's deprivation was caused by defendant's reliance on section 78–30–4, a statute which is clearly a product of the state. The more difficult question is whether defendant may fairly be said to be a state actor.

■ Suffice it to say that we agree with the logic of the two opinions that have already addressed this issue. Section 78–30–4 is self-operative. When an illegitimate child is relinquished by its mother, the rights of the father are automatically terminated unless he has previously filed an acknowledgment of paternity. A parent's rights may only be so terminated through the power of the state.[8] When a private party facilitates a mother's relinquishment, as was the case here, the party becomes a state actor if it also effectuates the state's termination of the father's rights.

## II. EQUAL PROTECTION

■ Plaintiff claims that section 78–30–4 discriminates on the basis of gender in violation of the equal protection clause of the fourteenth amendment to the United States Constitution. The statute requires the consent of the mother of an illegitimate child to the child's adoption, but does not require the consent of the father unless he files an acknowledgment of paternity with the Utah Department of Health. We have previously held under an equal protection analysis that "there are reasonable bases for the classifications in the statute (between unwed mothers and fathers and between fathers who file and fathers who do not) and that these classifications are reasonably calculated to serve a proper gov-

**3.** *Swayne v. L.D.S. Social Servs.,* 670 F.Supp. 1537, 1546 (D.Utah 1987).

**4.** *Swayne,* 761 P.2d 932.

**5.** *See Swayne,* 670 F.Supp. at 1540 n. 2.

**6.** *Rendell–Baker v. Kohn,* 457 U.S. 830, 837, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982);

*Swayne,* 670 F.Supp. at 1540; *Swayne,* 761 P.2d at 936.

**7.** *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), *cited in Swayne,* 761 P.2d at 936, *and Swayne,* 670 F.Supp. at 1541.

**8.** *Swayne,* 670 F.Supp. at 1542.

ernmental objective." [9]

Utah's registration statute was designed to facilitate permanent and secure placement of illegitimate children whose unwed mothers wish to give them up for adoption and whose unwed fathers take no steps to officially identify themselves and acknowledge paternity.[10] Because the identity of a mother of an illegitimate child is usually readily ascertainable, an unwed mother is forced to either immediately assume legal responsibility for the physical care of her child or relinquish her parental rights. Paternity, however, is more difficult to establish.[11] Even a father who informally acknowledges his responsibility for a pregnancy may later deny paternity and possibly avoid legal liability for his child's care. Thus, a reasonable basis for the different classification of unwed fathers and unwed mothers in section 78–30–4 is the fact that while identification of both parents of an illegitimate child is necessary, identification of a child's mother is automatic because of her role in the birth process, while identification of the father is not. A reasonable basis for the different classification of filing and nonfiling fathers is the state's need to distinguish those fathers who have accepted legal responsibility for the care of their children from those fathers who have not. Whether section 78–30–4 utilizes the best means for accomplishing this purpose involves policy issues which lie within the prerogative of the legislature to address. Nevertheless, we are sufficiently convinced that there are reasonable bases for the classifications in section 78–30–4 and that the classifications are reasonably calculated to serve a proper governmental objective.

■ Plaintiff also claims that section 78–30–4 violates the uniform operation of the laws provision of the Utah Constitution.[12] He contends that this is so because article IV, section 1 of the Utah Constitution [13] defines gender as an inherently suspect classification and thus gender-based discrimination of a fundamental right requires a compelling state interest—rather than a rational governmental objective—to pass constitutional muster. However, since plaintiff makes little effort to set forth an independent analysis of the appropriate state constitutional provisions, we are not bound to address his state constitutional argument.[14] Nevertheless, even if we were to accept the proposition that the Utah Constitution defines gender as an inherently suspect classification, defendant's claim would fail since "the mere existence of a biological link" by itself has not been deemed to create a fundamental right in an unwed father to parent his illegitimate child.[15]

■ Plaintiff also claims that as applied to the facts of this case section 78–30–4 violates his due process rights under both the federal and state constitutions. We have previously considered section 78–30–4 in *Ellis v. Social Services Department of the Church of Jesus Christ of Latter–Day*

---

9. See *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 204 (Utah 1984) (construing *Ellis v. Social Servs. Dep't*, 615 P.2d 1250, 1255–56 (Utah 1980)). We have also held that a lesser degree of protection is warranted "unwed fathers 'whose relationships to their children are merely biological or very attenuated,'" compared to the higher degree of protection warranted "fathers who have 'fulfilled a parental role over a considerable period of time.'" *Wells*, 681 P.2d at 203 (quoting *In re J.P.*, 648 P.2d 1364, 1375 (Utah 1982)); *Lehr v. Robertson*, 463 U.S. 248, 261–62, 103 S.Ct. 2985, 2993–94, 77 L.Ed.2d 614 (1983).

10. See *Wells*, 681 P.2d at 203.

11. Cf. *Kofford v. Flora*, 744 P.2d 1343 (Utah 1987) (discussion of paternity calculation using HLA test results).

12. Utah Const. art. I, § 24 ("All laws of a general nature shall have uniform operation.").

13. "The rights of citizens of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall enjoy equally all civil, political and religious rights and privileges."

14. See *State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988).

15. See *Lehr*, 463 U.S. at 261, 103 S.Ct. at 2993, quoted in *Wells*, 681 P.2d at 203; *supra* note 9. But cf. *In re J.P.*, 648 P.2d at 1372–74 (parental right deemed fundamental in parents who have established parental role over period of time).

*Saints,*[16] *Wells v. Children's Aid Society of Utah,*[17] *Sanchez v. L.D.S. Social Services,*[18] and *In re Adoption of Baby Boy Doe.*[19] Although we have held section 78–30–4 to be constitutional on its face, we have nevertheless noted that "a statute fair upon its face may be shown to be void and unenforceable as applied."[20] *Ellis* held that "when it is impossible for the father to file the required notice of paternity prior to the statutory bar, through no fault of his own[,] ... due process requires that he be permitted to show that he was not afforded a reasonable opportunity to comply with the statute."[21] In *Ellis,* both parents of an illegitimate child born in Utah were California residents. Shortly before she delivered, the mother came to Utah without telling the child's father. After the child's birth, she declared the father unknown, relinquished her parental rights, and gave the child up for adoption. When the father learned of the birth and the mother's action, he contacted the adoption agency, filed a notice of paternity, and sought custody of the child. We reversed the trial court's dismissal of the father's action and noted that if the father could show that it had been impossible for him to comply with section 78–30–4 and he came forward within a reasonable time after the baby's birth, he should be deemed to have fulfilled the provisions of the statute.

In *Wells,* we held that the reasonable opportunity standard adopted in *Ellis* was applicable when "it was 'impossible' for the father to file 'through no fault of his own.' "[22] Both *Wells* and *Sanchez* held that it was not impossible for the father to file a notice of paternity prior to the mother's relinquishment. *Baby Boy Doe,* on the other hand, found that the father had no reasonable opportunity to comply with the provisions of section 78–30–4. Despite their contrary outcomes, *Wells, Sanchez,* and *Baby Boy Doe* all rely on similar factors for determining whether it was impossible for a father to make a timely filing of notice of paternity through no fault of his own. Some of these factors include whether the unwed father was a Utah resident; whether he was aware of the mother's intent to place the child for adoption; whether the parties involved were aware of the father's desire to rear the child; whether the couple intended to marry or live together; whether the father was absent at the time of birth; and whether the father was misled concerning the need to protect, or prevented from asserting, his parental rights.[23] Summarized, the blanket factor common to all our cases dealing with the due process constitutionality of section 78–30–4 is simply whether an unwed father was aware of the need to protect his parental rights.

In *Baby Boy Doe,* this court stated:

[W]here a father does not know of the need to protect his rights, there is not "reasonable opportunity" to assert or protect parental rights. In such a case, the operation of the statute ... raises serious due process concerns. Although we have previously established that actual notice is not required prior to termination of parental rights under section 78–30–4(3), that determination was based at least in part on the assumption that "[n]otice requirements may be satisfied when necessarily implied," i.e., in the usual case where the putative father knows or should know of the birth and can reasonably take the timely action required to avoid the statutory bar.[24]

While we reaffirm the constitutional validity of the proposition that actual notice is not required prior to termination of parental rights, we recognize that other states

---

**16.** 615 P.2d 1250 (Utah 1980).

**17.** 681 P.2d 199 (Utah 1984).

**18.** 680 P.2d 753 (Utah 1984).

**19.** 717 P.2d 686 (Utah 1986).

**20.** *Ellis,* 615 P.2d at 1256.

**21.** *Id.* at 1256.

**22.** 681 P.2d at 208.

**23.** *See Baby Boy Doe,* 717 P.2d at 689–91; *Sanchez,* 680 P.2d at 754–55; *Wells,* 681 P.2d at 207–08.

**24.** *Baby Boy Doe,* 717 P.2d at 691 (quoting *Ellis,* 615 P.2d at 1256, n. 16) (citations omitted).

require that a putative father be given notice and a hearing prior to the severance of his parental rights or that he consent to the adoption of his child. States requiring consent often allow consent to be waived by the court after notice and a hearing.[25] Some statutes require notice to or the consent of a putative father only if the father has demonstrated a certain degree of involvement in the pregnancy or with the child.[26] Some statutes, similar to Utah's, require paternity registration to preserve parental rights.[27] Many statutes, however, allow a putative father a longer registration deadline than Utah's statute allows.[28] And Mississippi accords an unwed father no parental rights.[29]

■ In this case, we hold that it was not impossible for plaintiff to timely file a notice of paternity and avoid the statutory bar. He was a Utah resident; he was aware that Penny was under at least some pressure to place the child for adoption; his expressed desire to rear the child was indifferent at best. Indeed, Penny was aware of another child plaintiff had fathered out of wedlock who had been placed for adoption, apparently with plaintiff's consent, and at trial in this action, plaintiff admitted that he hoped his sister would provide for his child's care; he expressed no serious intent to live with or marry Penny nor relied on any representation of Penny's to marry or live with him; he was present at the time of birth and was even aware that he was required to sign a document to have his name placed on the child's birth certificate; and he was not misled or prevented from asserting his parental rights. In short, plaintiff should have been aware of the need to protect his parental rights by filing a notice of paternity.

Plaintiff also argues that section 78–30–4 violates his due process rights because "it does not provide adequate protection for the 'opportunity' of a biological father" to establish a parental relationship with his child. We have previously recognized that

[t]he state has a strong interest in speedily identifying those persons who will assume the parental role over [illegitimate] children, not just to assure immediate and continued physical care but also to facilitate early and uninterrupted bonding of a child to its parents. The state must therefore have legal means to ascertain within a very short time of birth whether the biological parents (or either of them) are going to assert their constitutional rights and fulfill their corresponding responsibilities, or whether adoptive parents must be substituted.[30]

The state allows a biological father to assume the legal obligation for the care of his child by filing a notice of paternity. At that time, the biological father stands in the same position as any other legally recognized father and may establish a relationship with his child. In this case, we cannot say that plaintiff's opportunity interest was not adequately protected by section 78–30–4.

■ Finally, plaintiff relies on *T.R.F. v. Felan*[31] for the proposition that he adopted his child by acknowledgment under Utah Code Ann. § 78–30–12 (1987) and thus his parental rights cannot be terminated. Section 78–30–12 states that when the father of an illegitimate child publicly acknowledges the child as his own, accepts it into his family, and treats it as though it were legitimate, the father adopts the child by acknowledgment and thus the provisions of the adoption statute (including section 78–30–4) do not apply.

The adoption by acknowledgment requirements are not as easily met as plain-

**25.** *See, e.g.,* Ala.Code § 26–10–3 (1986); Ariz. Rev.Stat.Ann. § 8–106 (1989); Ind.Code Ann. § 31–3–1–6.1 (Burns Cum.Supp.1989); Mo.Rev. Stat. §§ 453.040 (1986), 453.060 (Supp.1989).

**26.** *See, e.g.,* Haw.Rev.Stat. § 578–2 (as amended Supp.1989); Ill.Ann.Stat. ch. 40 ¶ 1510 (Smith-Hurd Cum.Supp.1989).

**27.** *See, e.g.,* Neb.Rev.Stat. § 43–104.02 (1988).

**28.** *See, e.g.,* Conn.Gen.Stat. §§ 46b–172a, 45–61d (1989); La.Rev.Stat.Ann. § 9:422.14 (Cum. Supp.1990); Minn.Stat. § 259.261 (1988).

**29.** *See* Miss.Code Ann. § 93–17–5 (1972).

**30.** *Wells,* 681 P.2d at 203.

**31.** 760 P.2d 906 (Utah Ct.App.1988).

tiff assumes. In *T.R.F.*, the biological father's name appeared on the child's birth and baptismal records; he provided substantial support for the child and its mother; he visited or lived with the child and its mother for extended periods of time; and he often took personal custody of the child during the first five years of its life.[32] In another case interpreting section 78–30–12, *Slade v. Dennis*,[33] the biological father was present at the child's birth, paid for the mother's medical expenses, placed his name on the child's birth certificate, registered timely paternity, had frequent custody of the child for the first two years of its life, and named the child a beneficiary of his health and life insurance.[34] Suffice it to say that plaintiff does not meet the previously established standard for adoption by acknowledgment.

We conclude, as did the court of appeals, that defendant's acts constituted state action and that section 78–30–4 is constitutional on its face and as applied to plaintiff. Having considered the parties' other claims on appeal, we find them to be without merit.

Affirmed; no costs awarded.

DAVIDSON, Court of Appeals Judge, concurs.

STEWART, J., concurs in the result.

HOWE, Associate Chief Justice, concurring and dissenting.

I concur in that part of the majority opinion which upholds the constitutionality of Utah Code Ann. § 78–30–4(3). I dissent from that part which holds that the acts of defendant L.D.S. Social Services constituted state action.

Decisions of the United States Supreme Court delineating when the acts of a private person or agency constitute state action do not support the majority's conclusion in the instant case. In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Court noted that its cases reflected a two-part

approach to the question of when conduct which allegedly causes the deprivation of a federal right may be fairly attributable to the state:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

457 U.S. at 937, 102 S.Ct. at 2753–54, 73 L.Ed.2d at 495.

Assuming that the first part of the Supreme Court's approach is met in the instant case, it is clear to me that the second part is not met, i.e., the defendant who received the child from the mother for adoption may not fairly be said to be a state actor. In a case decided by the Supreme Court the same day as it decided *Lugar v. Edmondson Oil Co.*, the Court provided the following illumination on the requirement of the second part:

The Court has concluded that the acts of a private party are fairly attributable to the state on certain occasions *when the private party acted in concert with state actors.* For example, in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 155–156[, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142] (1970) ... [t]he Court concluded that the restaurant acted under color of state law *because it conspired with the sheriff, a state actor*, in depriving the white teacher of federal rights.

Similarly, *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149[, 98 S.Ct. 1729, 56

---

**32.** 760 P.2d at 907–08.

**33.** 594 P.2d 898 (Utah 1979).

**34.** *Id.* at 899.

L.Ed.2d 185] (1978), and *Lugar, post,* p. 922, 102 S.Ct. p. 2744, illustrate the relevance of whether action was taken in concert with a state actor. The issue in *Flagg Brothers* was whether a warehouseman could be sued under § 1983 because it sought to execute a lien by selling goods in its possession pursuant to § 7–210 of the New York Uniform Commercial Code. While the sale was authorized by a state statute, and hence appeared to be threatened under color of state law, the Court did not reach that issue. Instead, it concluded that the warehouseman's decision to threaten to sell the goods was not "properly attributable to the State of New York," 436 U.S., at 156, [98 S.Ct. at 1733, 56 L.Ed.2d at 193,] since no state actor was involved....

In *Lugar,* a lessee obtained an ex parte writ of attachment pursuant to a state statute, which was executed by a sheriff. The Court held that § 1983 applied *because the involvement of the sheriff distinguished the case from Flagg Brothers.* [457 U.S. at 941, 102 S.Ct. at 2756, 73 L.Ed.2d at 498.] The lessee thus acted under color of state law and the sheriff's involvement satisfied the state action requirement.

*Rendell–Baker v. Kohn,* 457 U.S. 830, 838–39 n. 6, 102 S.Ct. 2764, 2770 n. 6, 73 L.Ed.2d 418, 426 n. 6 (1982) (emphasis added). In that case, a private school whose income was derived primarily from public sources and which was regulated by public authorities was held not to have acted under color of state law for purposes of 42 U.S.C. § 1983 when it discharged certain employees.

In the instant case, petitioner contends that the acts of defendant constituted state action because

only the state can terminate parental rights and Utah's statute invests private parties with the power to effect such a termination of the rights of an unwed father. The defendants, therefore, have been invested by the statute with a power reserved for the sovereign. When they exercise this power they are engaging in an action only the state can take

and are, therefore, properly characterized as "state actors."

This contention must fail because it is based on a faulty assumption. Defendant has not been given any power to terminate the father's inchoate rights. That comes about by operation of law pursuant to a predetermined state statute, and not by any act or discretion of defendant. As the majority states, the statute is "self-operative." Defendant is without power or authority to make any decision relative to the termination. Simply because the legislature has provided in Utah Code Ann. § 78–30–4(3)(b) that the placement of an illegitimate child by his mother with an adoption agency terminates the opportunity for the father to register his claim of paternity does not, without more, turn every adoption agency into a "state actor." Unlike *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and *Lugar v. Edmondson Oil Co.,* 457 U.S. at 922, 102 S.Ct. at 2744, 73 L.Ed.2d at 482, no state officer or employee was involved in the instant case. It is undisputed that defendant receives no state funding and the state has no control over the agency's internal affairs. The cases simply do not support the theory that when a private person exercises a right or privilege granted by state law (such as to receive children for adoption), that person becomes a state actor. If that were so, every person licensed by the state in the various trades, occupations, and professions would become state actors. State action is not brought about by the sole fact that the legislature has coincidentally fixed the date the mother relinquishes the child to the agency as the termination date of the father's right to register. Another date could have just as well been chosen by the legislature, such as the date of the child's birth. The Supreme Court cases require much more of a nexus than is present in the instant case to produce "state action."

In this conclusion, I am supported by our observation in *Sanchez v. L.D.S. Social Services,* 680 P.2d 753, 755 n. 2 (Utah 1984), that even if the adoption agency had a duty to inform the father of his right to

register his notice of claim and the agency breached that duty, there would not be state action. That would be a much stronger set of facts than is found in the instant case, where it is not contended that defendant owed petitioner any duty. See also *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir.1983), where a psychologist and an L.D.S. bishop reported to the police that two children had been kidnapped following placement by L.D.S. Social Services. The court held that this reporting to the police did not constitute state action although it triggered the arrest of the alleged kidnappers by the police.

I would hold that there was no state action here.

ZIMMERMAN, Justice, concurring and dissenting.

I concur in the Chief Justice's opinion to the extent that it holds that the actions of L.D.S. Social Services constitute state action under the fourteenth amendment to the United States Constitution. U.S. Const. amend. XIV.

With respect to the federal equal protection analysis, I would hold that under the circumstances of this case—where the father's identity was known to all concerned, he had informally acknowledged his paternity, he was readily available, he had indicated a desire to participate in the raising of the child, but he had failed to file a formal acknowledgment of paternity within four days of his child's birth—section 78-30-4(3) operates to deny the father equal protection of the laws. This is so because in its operation, the statute cuts off entirely any rights the father may have to develop a relationship with his child but does not cut off the rights of a similarly situated mother. No matter how uninterested a mother may be in her child, even if she abandons her child immediately upon birth, she need file no formal papers to perfect her parental rights. And her rights in the child cannot be terminated except through a formal judicial proceeding. *See* Utah Code Ann. § 78-3a-48 (1987).

In our decisions in *Ellis v. Social Services Department of the Church of Jesus Christ of Latter–Day Saints*, 615 P.2d 1250 (Utah 1980), and *Wells v. Children's Aid Society*, 681 P.2d 199 (Utah 1984), we held that the equal protection clause was not offended by this statute. In neither of those cases, however, did we subject the statute to any reasoned discussion of the equal protection standard to be applied. In *Ellis*, we proceeded without any discussion of the standard at all. In *Wells*, the entire discussion of the equal protection standard was one sentence stating that the test implicitly applied in *Ellis* was the weak rationality standard of scrutiny used to analyze challenges to garden-variety economic and police power measures that do not affect any fundamental rights. *Wells v. Children's Aid Soc'y*, 681 P.2d at 204. Virtually any statutory classification can be sustained under such a standard. *See, e.g., Blue Cross and Blue Shield v. State*, 779 P.2d 634, 637, 641 (Utah 1989); *Condemarin v. University Hosp.*, 775 P.2d 348, 357, 359 (Utah 1989); *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 889 (Utah 1988).

That permissive analysis is not suitable for weighing the attack on section 78-30-4(3). That provision operates to deprive fathers of their inchoate right to develop a relationship with their illegitimate children. I would find such a right to be of a sufficiently fundamental nature that the level of scrutiny required is strict. *Cf. Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (established relationship with child important criterion in evaluating rights of parent). The strict scrutiny test requires a close analysis of the means used by the state to achieve even a legitimate legislative end. Casenote, 1967 Utah L.Rev. 566, 569–72; *see, e.g., Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980) (strict scrutiny applied where speech rights restricted).

The statute fails the strict scrutiny test. It does not use a means that is carefully tailored to accomplish a legitimate legislative end without unduly infringing on the father's fundamental interest at issue. The state may have a legitimate interest in

easing the way for the adoption of illegitimate children and in speedily resolving questions about the identity of the fathers, but that objective does not require or justify the undiscriminating, across-the-board, gender-based distinction upon which the statute relies. *Cf. Mississippi University for Women v. Hogan*, 458 U.S. 718, 725–26, 102 S.Ct. 3331, 3336–37, 73 L.Ed.2d 1090 (1982). It is a draconian measure that stereotypes fathers of illegitimate children and treats them all alike, while treating all mothers quite differently. This statutory provision appears designed entirely for the convenience of child placement agencies, an impression that has been strengthened by the arguments of all parties before this court. For these reasons, I would hold that the statute denies equal protection of the laws to Swayne.

Because I would reverse on the basis of a federal equal protection analysis, I see no reason to address the federal due process question at length. I do note that I have serious constitutional reservations about the complete lack of a notice requirement under section 78–30–4(3), especially when the father is known and available. However, I also recognize that this court has found that no such notice is required constitutionally. *See Wells v. Children's Aid Soc'y*, 681 P.2d at 207; Zanolli, *The Unwed Father and Adoption in Utah: A Proposal for Statutory Reform*, 1989 Utah L.Rev. 115, 137 (proposing a statutory notice requirement).

There are several state constitutional issues raised by petitioner. The majority, in a single sentence, purports to dispose of those questions, but without any real analysis. In my view, the summary treatment given those issues by the majority has not settled them. Moreover, I think those claims are not facially meritless. For that reason, I venture a few comments on the state constitutional claims in the hope that future briefing on this point will be better framed.

The majority seems to have little trouble rejecting petitioner's claim that he has a fundamental right at stake under the federal constitution. I think the question of the fundamentality of the interests at issue will be more troublesome for the majority when it is addressed fully under the Utah Constitution.

Under both Utah's uniform operation of the laws provision, article I, section 24, and Utah's due process provision, article I, section 7, the strictness of the scrutiny to be given the relationship between the means used and any legitimate legislative ends to be attained would be determined, as it is under the federal constitution, by reference to the degree of sanctity accorded the rights involved. *See Condemarin v. University Hosp.*, 775 P.2d at 367–68 (Zimmerman, J., concurring in part); *Blue Cross and Blue Shield v. State*, 779 P.2d at 637.[1] However, there is no necessary correspondence between the value placed upon an interest or right of the people by the federal constitution and the value accorded it by the state constitution. For example, the Utah Constitution recognizes in the open courts provision of article I, section 11 the right of the people to obtain redress for certain civil wrongs, but there is no parallel recognition of these rights or interests in the federal constitution. As a result, we have provided a much higher level of protection for these interests under the state constitution. *See Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985). So too, the Utah Constitution specifically provides that men and women have a right to be treated equally. Article IV, section 1 provides, "Both male and female citizens of this State shall enjoy equally all civil, political and religious rights and privileges." Utah Const. art. IV, § 1. There is no such provision in the federal constitution, and the United States Supreme Court has been

---

1. And under Utah constitutional analysis, if an interest or right of the people is given special sanctity by the constitution and that interest or right is infringed by a challenged statute, not only is a strict scrutiny standard applied, but also the presumption of validity normally accorded legislative action is reversed and the burden is imposed on the proponents of the legislation to justify the infringement. *See Condemarin*, 775 P.2d at 353–65 (Durham, J.); *id.* at 368 (Zimmerman, J., concurring in part); *id.* at 372–74 (Stewart, J., separate opinion).

very reluctant to recognize any such requirement of equal treatment. Therefore, while we might not accord those interests much weight in making a federal constitutional analysis of a statute infringing upon them, we could not so easily avoid recognizing their importance under the Utah Constitution.

In my view, if we were to fully consider a challenge to section 78–30–4(3)'s infringement upon the interests protected by article IV, section 1 of the Utah Constitution, under either the uniform operation of the laws provision, article I, section 24, or the due process provision, article I, section 7, the statute could not pass muster, and the ultimate result would be the same as I would reach under the federal constitution.

DURHAM, Justice, having disqualified herself, does not participate herein; DAVIDSON, Court of Appeals Judge, sat.